These consolidated appeals are from an action brought by appellee James A. Garrett for personal injuries he sustained when the automobile he was driving was struck by appellant L 
N's train and an action brought by appellee Mae B. Garrett, his wife, for loss of consortium.
On February 23, 1977, Mr. and Mrs. Garrett traveled from their home in Tarrant City, Alabama, to visit their son at his home in Huntsville. The couple traveled in their car with Mr. Garrett driving and Mrs. Garrett occupying the passenger's seat. Mr. Garrett, age seventy-seven, is a retired miner from U.S. Pipe Foundry Company.
The collision occurred at about 1:48 PM at a crossing of L 
N's right-of-way with Whitesburg Drive in Huntsville. The Garretts testified that they travel to Huntsville *Page 670 
once or twice a year to visit their son and almost always travel the route which passes through the Whitesburg crossing. Mr. Garrett estimated that they had traveled through the crossing twelve or fifteen times prior to the accident.
L N's track runs generally north-south while Whitesburg Drive, at the point of intersection with L N's track, runs east-west. The track intersects Whitesburg Drive at an acute angle. At the time of the accident, L N's train was proceeding south while the Garretts were proceeding east. There were no flashing lights or drop-arms at the crossing; however, there were cross-arms on both sides of the track and an overhead sign warning of the crossing. The cross-arm facing the Garretts as they approached the track was bent forward and one arm of the X was bent backwards. The sign was also rusted. Vegetation consisting of weeds, bushes, and Johnson grass had grown around the crossing which the Garretts allege obscured the view of the track. The evidence was conflicting as to the degree of visibility of the track as one approached the crossing.
Mr. Garrett testified that he stopped for a traffic light at the intersection of Whitesburg Drive and the Parkway shortly before reaching the crossing. When the light turned green, he turned onto Whitesburg Drive and proceeded toward the crossing. As he drew near, he stated he slowed down to about three or four miles per hour. He testified that he stopped the car for a few seconds a short distance from the track while a car across the track backed from a side road out into his lane, stalled, and restarted after some delay. On cross-examination, Mr. Garrett estimated that he stopped at a distance of fifteen to thirty feet from the track. Mr. Garrett claims that he looked down the track in both directions while waiting for the car to move. He stated that plant growth obscured much of his view down the track to the left, the direction from which the train approached the crossing. He described the track as looking "like it was coming out of a cotton patch." On cross-examination, Mr. Garrett stated that he looked to his right while stopped, but was already moving again before he looked to his left.
Mr. Garrett testified that after the car across the track moved, he started off at about three or four miles per hour and about the time the front wheels of his car reached the track he noticed the train to his left about 150 feet away. Mr. Garrett described his response as follows: "I cut my car to the right and shot the gas to it and jumped off to the right." He testified he remembered nothing further regarding the accident and his next recollection was waking up after emergency surgery in a Birmingham hospital. On cross-examination, Mr. Garrett admitted that he assumed the crossing was abandoned and did not intend to stop for it.
Mrs. Garrett corroborated her husband's testimony. Neither witness heard any whistle signal or bell and both stated that the train's headlight was not burning. Both car windows of the Garrett vehicle were lowered a few inches and the radio was off.
Mr. Counts, the engineer, testified that there were several grade crossings immediately north of the crossing in question, the nearest one located by a carwash a quarter of a mile away. Mr. Counts testified that he sounded the train whistle three times during the quarter-mile between the carwash crossing and the Whitesburg crossing. He also testified that a bell on the train rang continuously from the carwash crossing until after the collision. He testified that the speed of the train as it approached the Whitesburg crossing was twenty miles per hour. The maximum permissible speed was thirty miles per hour.
Mr. Counts stated that he was seated on the left side of the engine and his responsibility was to watch for traffic approaching from that direction. The long end of the engine was forward and blocked his view to the right, the direction from which the Garrett's approached the crossing. The reserve engineer and brakeman were seated on the right side of the engine with responsibility for watching for traffic in that direction. *Page 671 
Mr. Counts testified that as the train approached the Whitesburg crossing, he saw an automobile pull up on the left and stop immediately before the train reached the crossing. He stated that he did not see the Garretts' car, coming from the right, until the front of the car passed in front of the train at which time he immediately tried to put on the emergency brake. However, the brake had already been put in full emergency by the reserve engineer. Mr. Counts stated that the train came to a stop about 200 feet past the crossing.
Mr. Smith, the reserve engineer, testified that he was sitting on the right of the locomotive as the train approached the crossing and that the bell had been rung and the whistle blown for the crossing. He stated that he first saw the Garrett vehicle coming from his right about 200 or 300 feet from the crossing. He never looked away from the vehicle from the moment he saw it and testified that it never stopped. He stated that he put the brake in emergency when the train was forty to fifty feet from the crossing and the automobile was twenty to twenty-five feet from the crossing. He stated that after he set the brake, he saw the automobile swerve to the right and then lost sight of it. He further stated that he did see one car come over the crossing just before the train arrived, but never saw a car stalled in the road. Mr. Smith also remembers that the train's headlight was burning when they left the Huntsville depot and was still on after the accident.
Mr. Bradley, the brakeman, testified that he was seated on the right side of the locomotive and that Mr. Counts blew the whistle for the carwash crossing and continued the whistle signals up until the time of the collision. He testified that the headlight was on when they left the Huntsville depot. He stated that he first saw the Garrett vehicle about 150 feet from the crossing. He testified that he kept the automobile in view at all times and that he never observed the automobile stop before reaching the crossing where it swerved to the right and left his field of vision. He estimated the speed of the automobile as about twenty-five miles per hour.
Denise Whitfield and Randy Humphries were employees of Kentucky Fried Chicken which is located near the crossing. Both parties witnessed the collision. Ms. Whitfield testified that she observed the Garrett automobile proceed toward the crossing and that it never stopped before reaching the crossing. She did state that about ten or fifteen feet from the track she saw the brake lights come on for "just a second," but did not notice any decrease in speed. She stated that the car proceeded onto the track where the train "caught the backside." She estimated that the vehicle was traveling fifteen miles per hour. Ms. Whitfield further testified that she did not see any car back onto Whitesburg Drive and stall. Randy Humphries testified he watched the Garrett car continuously from the Parkway to the crossing and never saw it stop.
Richard Kucejko testified that he was driving on Whitesburg Drive in the opposite direction of the Garretts. He stated that he stopped for the train at the crossing where he watched the Garretts approach the crossing. He testified that they never stopped. Another witness, Mr. Masters, testified that he was proceeding on Whitesburg Drive behind the Garretts at the time of the collision. He stated that he observed the Garretts' car from the Parkway to the crossing and that it never stopped nor visibly slowed down. He further stated that he did not see a car stall on the other side of the crossing.
Mr. Garrett was knocked unconscious for a short while after the collision and was taken to Huntsville Hospital for tests. He was released from the hospital that evening and the couple went on to their son's house and stayed two days through Friday. The following Tuesday, Mr. Garrett went to see his doctor in Birmingham complaining of severe headaches; a concussion was diagnosed. Mr. Garrett was instructed to return to the doctor at two-week intervals for observation and testing and was continued on coumadin, an anticoagulate, prescribed for him as a result of a mild stroke suffered *Page 672 
in January 1976. Coumadin patients are subject to increased dangers of bleeding due to trauma. As a result of the stroke, Mr. Garrett was required to remain under continuing medical supervision.
After the second follow-up visit, Mr. Garrett went into a coma. His condition was diagnosed as a subdural hematoma caused by pressure arising from bleeding within the skull cavity, and surgery was performed within hours. Mr. Garrett recovered from the surgery, but claims that he is totally disabled and can no longer participate in many activities that he normally engaged in prior to the accident such as driving, fishing, gardening, and yard work. Moreover, he has to take medication to guard against epileptic seizures. Medical testimony established a twenty-five to thirty percent disability in his left arm and leg.
Mr. Garrett filed suit against L N and W.B. Counts claiming $500,000 as damages for personal injury and $2,000 for damage to his car. Counts One and Two of his complaint asserted liability under the doctrine of respondeat superior for the negligence or wantonness of L N's employee in allowing the train to collide with the Garretts' automobile. Count Three included a claim for damage to the automobile. Mr. Garrett amended his complaint adding Counts Four, Five and Six claiming negligence or wantonness of the part of L N in causing or allowing the collision. Mr. Garrett subsequently amended his complaint again adding Counts Seven, Eight and Nine asserting negligent or wanton entrustment.
Mrs. Garrett filed suit against both Mr. Counts and L N for loss of consortium based upon the same theories of liability. The actions were consolidated for trial.
Defendants Counts and L N, in their answer as amended, admitted the occurrence of the collision, admitted that Mr. Counts was an employee acting within the line and scope of his authority, but denied all other allegations. Defendants affirmatively pled contributory negligence, and L N asserted a counterclaim for $500 for damage to the locomotive.
The Garretts served interrogatories on defendants, several of which pertained to prior accidents involving Mr. Counts while operating a railroad locomotive. L N objected to the interrogatories relating to such prior accidents and the Garretts sought an order compelling L N to answer. In response, L N moved to strike the counts of the complaint alleging negligent and wanton entrustment on the theory that negligent entrustment is a "second avenue, alternative to respondeat superior, by which to fasten liability for negligence of the operator of a vehicle or other instrumentality" when respondeat superior is undisputed. Therefore, since L N admitted the agency of Mr. Counts, it contended that liability is predicated under respondeat superior so the issue of entrustment and evidence of prior suits involving Mr. Counts became immaterial.
The trial court granted defendant's motion to strike the wanton entrustment count, but denied the motion as to negligent entrustment and ordered L N to answer the interrogatories. Subsequently, pursuant to the motion of the Garretts, L N was ordered to produce all records made by any agent concerning any accident involving Mr. Counts as an employee of L N. After such files were produced on the day of trial, the court struck the negligent entrustment count.
The case proceeded to trial, and the jury returned a verdict in favor of the Garretts. The jury expressly found in favor of Mr. Counts and against appellant L N. Mr. Garrett was awarded $95,000, and Mrs. Garrett was awarded $20,000. After its motion for new trial was overruled, L N gave notice of appeal. The two cases were consolidated for purposes of appeal.
L N asserts various errors in the trial below. L N first asserts error in the giving of certain oral charges and the refusal to give certain requested charges. L N argues that the trial court erred in giving the following oral charge in respect to maintenance of the right-of-way and signals: *Page 673 
 The reason I break down the two types of verdict that could be rendered in the case is that we have two Defendants, one W.B. Counts, the train operator, and the company, the railroad company. I think under the facts and circumstances in the case separate verdicts could be rendered. So if you are reasonably satisfied from the evidence that W.B. Counts was not negligent or wanton in the operation of the train and the Plaintiff, James A. Garrett, was not contributorially negligent that proximately caused his injuries, but you are reasonably satisfied from the evidence that the L N Railroad Company was negligent or wanton and did not exercise reasonable care in maintaining the right of way and the signals, and that the failure to maintain said right of way and signals at the crossing was the proximate cause of the Plaintiffs injuries, then your verdict could be for Plaintiffs and against the Defendant, L N Railroad, only.
Similarly, L N contends it was error to refuse its requested charge number 38 which reads:
 I charge you that the law does not require that a party be given notice or warning of a danger that he already is aware of and, therefore, if you are reasonably satisfied from the evidence that James A. Garrett was aware of the existence and location of the railroad crossing, then you should disregard any evidence as to the absence or the condition of any signs or signals to give warning of it.
L N further asserts that it was error to refuse to give its requested charge number 36 to the effect that a motorist must stop, look, and listen unless "excused from doing so by reason of circumstances that would render those precautions entirely vain" and error to give the following oral charge:
 The law of Alabama places certain other duties upon a person intending to cross a railroad track, to have a general duty to stop, look and listen. So a person in the process of approaching and attempting to cross a railroad track, with knowledge on his part of the location of the railroad track, is under a duty to stop, look and listen for approaching trains. This use of his senses must be made within such nearness to the track and under such circumstances as will afford the traveler a line of knowledge of whether he may cross the track with reasonable safety from collision with an approaching train. Such duty is also a continuing duty during his attempt to cross between the time he has last stopped, looked and listened, if he did so, and the time he entered the zone of danger made by trains entering the crossing. So the law does not set any set distance to stop. The distance the Plaintiff should have stopped from the track in order to comply with his duties of stopping, looking and listening before going upon this crossing is not a set number of feet or any other arbitrary rule, but is dependent upon the facts of this particular case. If under the circumstances of this case, you are reasonably satisfied from the evidence that the Plaintiff acted as a reasonable prudent person would have acted under the same or similar circumstances, then the Plaintiff could not have been guilty of contributory negligence. It is not a matter of law in every case under all circumstances that it is an absolute duty to stop, look and listen before a traveler goes on a railroad crossing. Ordinary care often depends upon the facts of the particular case. So the rule of stop, look and listen is not arbitrary or invariable at the time and place. It may depend in some measure upon the familiarity of one passing the place of crossing. He cannot always be said to be guilty of contributory negligence because he failed to stop, look and listen at one particular time or place rather than at another time.
In order to preserve an error in charging the jury for our review, it is necessary that the party make an objection and state the grounds therefor. ARCP 51 provides in pertinent part:
 No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, *Page 674 
incomplete, or otherwise improper oral charge unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection. [Emphasis added.]
The reason for the rule is to "give the trial court an opportunity to correct the instructions and to avoid the waste of time and money from reversals that result from oversight, technical omissions, or remedial mistakes." Feazell v.Campbell, 358 So.2d 1017, 1020 (Ala. 1978).
In the instant case, L N made the following objections respecting the charging of the jury:
 Your Honor, we except to the refusal of our charges, written requested charges, so marked, and to the following portions of the Court's oral charge: Wherein the Court charged the jury, in part, first, further that the Defendant, L N Railroad Company, has certain statutory duties, one being that every railroad company has the duty to maintain, and then tracking the language of the sign statute, signs giving warning of the crossing.
 Secondly, the Defendant excepts to that portion of the Court's oral charge wherein the Court instructed the jury, in substance, as follows: Also the failure of the Defendant to maintain signs is prima facie negligence.
 Further, the Defendants except to that portion of the Court's oral charge wherein the Court charged the jury, in substance, as follows: It became the duty of the engineer or other persons in control of the train, as soon as he discovered the peril of the Plaintiffs, to use all means known to skillful engineers to stop or slacken the speed of trains.
 Further, the Defendants except to that portion of the Court's oral charge wherein the Court instructed the jury, in substance, as follows: If you are satisfied that the Plaintiff acted as a reasonable prudent person would have acted under the circumstances he could not be guilty of contributory negligence.
 Further, the Defendants except to that portion of the Court's oral charge wherein the Court instructed the jury, in substance, as follows: Violation of statutes is negligence as a matter of law and a train operator must maintain a proper lookout to discover vehicles using the highway.
 Further, the Defendants except to that portion of the Court's oral charge wherein the Court instructed the jury, in substance, as follows: If you are reasonably satisfied from the evidence that the Defendant, L N Railroad, was guilty of negligence or wantonness in failing to maintain the right of way and the signals your verdict should be for the Plaintiffs and against the Defendant, L N Railroad.
L N properly stated the matters to which it objected; however, it did not state the grounds therefor. Rule 51 expressly requires that a party must state the grounds for his objection and the failure to do so is fatal to appellate review of the errors complained of. Although in Gardner v. Dorsey,331 So.2d 634 (Ala. 1976) and Hosey v. Seibels Bruce Group, SouthCarolina Insurance Co., 363 So.2d 751 (Ala. 1978) the objections to the court's oral charge were found sufficient notwithstanding the failure to state the grounds therefor, these cases hold that the grounds requirement is excused only in the limited circumstance where the party makes a specific objection and the charge involves a misstatement of substantive law. The errors complained of in the instant case involve more than a mere misstatement of substantive law. Accordingly,Gardner and Hosey are inapposite, and we do not reach the merits of L N's contentions as to errors in the trial court's oral charge.
L N also contends that it was error for the trial court to refuse to strike the negligent entrustment count at the pre-trial hearing, and accordingly, to order L N to produce its files concerning any prior accident involving Mr. Counts. It was within the trial court's discretion whether to strike the negligent entrustment count. L N contends that the documents were *Page 675 
immune from discovery under ARCP 26 (b)(3) since they were prepared in anticipation of litigation and reflect the mental impressions, conclusions, and opinions of its agents and attorneys, and plaintiffs made no showing of substantial need and undue hardship. We are unable to ascertain from the state of the record whether or not the documents in question were protected from discovery, and therefore, we cannot say that the trial court erred in requiring L N to answer the interrogatories by producing such documents. See Rushton v.Shugart, 369 So.2d 11 (Ala. 1979).
L N also contends that the trial court erred in failing to sustain L N's objection to a question posed to a police officer on cross-examination as to his opinion whether the cross-arm should have been replaced. The following exchange occurred at trial:
 Q. Couldn't you agree with me that that's a pretty sorry road marking sign right there, pointing to Plaintiffs' Exhibit 7? Now, that picture was taken in September 1977, a year after you investigated Mrs. Stewart's accident. Couldn't you and I agree that that doesn't meet the standard of good signs?
 A. I couldn't say what the standards of the railroad crossings are.
Q. Well, apply your knowledge as a traffic officer.
 A. I would say that this sign needed to be replaced.
 Q. If I told you that sign had been knocked over in that position in October of 1976 and had not been touched until today, and the railroad knew it, would you say that they ought to get busy and replace it?
MR. P. RICHARDSON: We object. That's immaterial.
THE COURT: Overruled. It's cross-examination.
A. Yes, sir, it does need to be replaced.
 Q. That's a valuable sign for motorists coming down that way and don't know it. They have got to be warned, haven't they?
A. Yes, sir.
We deem the failure to sustain L N's objection harmless error since the officer previously stated without objection that in his opinion the sign should be replaced.
Lastly, L N contends that the only basis of liability asserted against it is that under the doctrine of respondeat superior (since the negligent and wanton entrustment counts were stricken); therefore, the verdict holding it liable while exonerating engineer Counts is erroneous as a matter of law since there is no liability of the master in the absence of liability of the servant.
Although the jury was instructed that it could find L N liable for negligent maintenance of the right-of-way and evidence was adduced as to plant life obstructions to view, there is no independent action for negligently permitting plant life obstructions to grow on the right-of-way. In Alabama GreatSouthern R. v. Johnston, 281 Ala. 140, 199 So.2d 840 (1967), this court held that such obstructions are not actionable per se but only go to the commensurate degree of care required of the railroad in operating its train through the crossing in light of the obstructions to view. In reaching this result, the court relied upon the following language in Cowles v. New York,New Haven Hartford R., 80 Conn. 48, 66 A. 1020 (1907):
 We think that the mere neglect to cut down such trees, whether causeless or not, whether they could be cut down with slight trouble and expense or not, is not, in the absence of any statute requiring railroad companies to keep their right of way free from unnecessary obstructions to a view of their tracks and trains by persons using an adjacent highway, in itself actionable negligence.
. . . . .
 We have never before had occasion to discuss this question, and must therefore treat it as an open one. For the reasons above suggested, we are satisfied that, while trees growing upon land adjacent to the highway, including land owned by the railroad company, which substantially *Page 676 
obstruct the view of a traveler approaching the grade crossing, is clearly one of the circumstances, to be considered in determining whether the railroad company exercised ordinary care in the operation of its cars at a particular time, yet the mere neglect of the company to cut down trees on its own land although proper to be considered with all the surrounding circumstances affecting the care required at that time is not in itself a violation of any legal duty the company owes to a passing traveler
(unless so made by statute), and is not there in the absence of any other negligence a neglect which constitutes actionable negligence.
66 A. at 1023 (emphasis added). See also Rachal v. Texas Pacific Ry., 61 So.2d 525 (La.App. 1952). Therefore, for a railroad to be liable, there must be some other act or omission which, when considered with the obstructions to view, amounts to actionable negligence. Accordingly, the basis of liability is under the doctrine of respondeat superior since the railroad's liability stems not from allowing plant life obstructions but vicariously for the act or omission of an employee in operating the train negligently as judged in light of all the circumstances including obstructions to view.
Here, the case was tried to the jury on counts of negligence and wantonness. The jury found for the Garretts against L N and exonerated engineer Counts. L N's motion for new trial was overruled by the trial court thereby strengthening the jury verdict with all its attendant presumptions. Alabama GreatSouthern R. v. Evans, 288 Ala. 25, 256 So.2d 861 (1972). Of course, the general rule is that a verdict exonerating a servant relieves the master of liability when the particular servant's conduct is the only basis of liability against the master. Id. But the potential basis of liability against L N in this case is not only the conduct of engineer Counts.
There was evidence that the train's whistle or bell was not blown or rung and that the headlight was not burning. However, Counts testified that he did sound the whistle and ring the bell although he could not remember whether the headlight was burning. Since the jury exonerated Mr. Counts of any negligence, it can be inferred that he properly sounded the whistle and rang the bell. But, Counts was seated as "lookout" on the left side of the engine while the reserve engineer Smith and brakeman Bradley were seated on the right side with responsibility for watching for traffic in that direction — the direction from which the Garretts were approaching. The brakeman, Bradley, testified that he observed the Garretts continuously from when they were about 150 feet from the crossing. The reserve engineer, Smith, testified that he watched the Garretts continue from 200 feet away to 20-25 feet away when he engaged the emergency brake. But the Garretts testified that the crossing was grown up with grass, weeds, bushes and trees which prevented them from seeing down the track. Therefore, this evidence made out an issue for the jury as to whether the crossing was so obscured as to prevent the Garretts from being seen, and likewise, the train crew from seeing them. Thus, the jury could have exonerated Counts, the engineer, because it could have determined that Smith, the reserve engineer, or Bradley, the brakeman, did not keep a proper lookout; that the crossing was so obscured as to prevent a proper lookout; or that upon discovering the Garretts' peril, Smith and/or Bradley were negligent in responding. Therefore, the sole basis of liability against L N was not the conduct of engineer Counts and the verdict exonerating engineer Counts while finding L N liable is not inconsistent and erroneous as a matter of law.
Accordingly, the case is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and BLOODWORTH and FAULKNER, JJ., concur.
ALMON and EMBRY, JJ., concur in the result. *Page 677