Appellant, The First National Bank of Birmingham, appeals from a summary judgment granted in favor of appellees, Mr. and Mrs. Culberson. The issue on appeal concerns the priority to real property which each party claims. We reverse and remand.
George Griffin was a real estate developer in the Jefferson County area. He incorporated two companies to aid him, Residential Planners, Inc., designed to be the area developer, and Planned Homes, Inc., the builder of homes. Residential Planners' certificate of incorporation was filed on November 25, 1970 in the Probate Judge's Office of Jefferson County. Planned Homes' certificate of incorporation was filed on December 14, 1970 in the Probate Judge's Office of Jefferson County. The charter and by-laws of these corporations were practically identical, as the record shows. Appellees assert that they were so identical that they were in legal effect one corporation with two names.
The real property to be developed was a tract of land lying entirely within the Bessemer *Page 348 
Division of Jefferson County. It was conveyed to George Griffin from Otis D. Coston and wife by warranty deed dated November 22, 1971, and recorded in the Birmingham Division on December 1, 1971 in real volume 772, page 839. On that same November 22, 1971, Residential Planners, Inc. conveyed this same property to Cobbs, Allen Hall Mortgage Company and this mortgage was recorded in the Birmingham Division simultaneously with the deed from the Costons to Griffin.
Later, a corrective warranty deed of the same property from the Costons to George Griffin, undated but acknowledged on January 31, 1972, was recorded on February 3, 1972 in theBessemer Division of Jefferson County to "CORRECT THAT CERTAIN DEED RECORDED IN REAL VOLUME 772, PAGE 839, IN THE OFFICE OF THE JUDGE OF PROBATE OF JEFFERSON COUNTY, ALABAMA" (Emphasissupplied). A second corrective deed of the same property, acknowledged the same day, from George Griffin and wife to Residential Planners, Inc., was recorded in the Bessemer
Division on February 3, 1972 simultaneously with the corrective deed from the Costons to Griffin (the mortgage from Residential Planners, Inc. was recorded in the Bessemer Division at this time). The second corrective deed recited that it was "TO CORRECT THAT CERTAIN DEED RECORDED IN REAL VOLUME 772, PAGE 839, (the original Costons to Griffin deed) IN WHICH THE NAME OF THE GRANTEE WAS MISTAKENLY ENTERED AS GEORGE GRIFFIN IN LIEU OF RESIDENTIAL PLANNERS, INC."
To recapitulate, the title transactions were in this sequence:
Nov. 25, 1970: Incorporation of Residential Planners, Inc.
Dec. 14, 1970: Incorporation of Planned Homes, Inc.
Nov. 22, 1971: Deed from Costons to Griffin.
Nov. 22, 1971: Mortgage from Residential Planners, Inc. to Cobbs, Allen Hall.
Dec. 1, 1971: Mortgage from Residential Planners, Inc. recorded in Birmingham Division.
Dec. 1, 1971: Mortgage from Residential Planners, Inc. to Cobbs, Allen Hall recorded in Birmingham Division.
Jan. 31, 1972: Deed from Costons to Griffin to correct deed of Nov. 22, 1971.
Jan. 31, 1972: Deed from Griffins to Residential Planners, Inc. to correct deed of Nov. 22, 1971.
Feb. 3, 1972: Recordation in Bessemer Division of two correction deeds and mortgage from Residential Planners, Inc. to Cobbs, Allen Hall.
July 20, 1972: Building Construction Agreement "between" Culbersons and Planned, signed by Culbersons and Residential (by Griffin as President of Residential, for building to be constructed on Lot 5, Sterling Manor West (unrecorded).
Sept. 27, 1972: Deed of Lot 4 from Residential Planners, Inc. to Planned Homes, Inc.
Release by Cobbs, Allen Hall of Lot 4 from mortgage of November 22, 1971.
Future Advance Mortgage on Lot 4 from Planned Homes, Inc. to First National Bank.
Oct. 3, 1972: Instruments of Sept. 27, 1972 recorded in Bessemer Division.
April 26, 1973: Deed of Lot 4 from Planned Homes, Inc. to Culbersons.
May 25, 1973: Recordation of Culberson deed in Bessemer Division.
One of the many couples who chose to invest in Griffin's development are the appellees, who arranged with Griffin to have a house constructed for them. Following their negotiations, the Culbersons delivered to Planned Homes, Inc. a $5,000.00 check drawn on The First National Bank of Birmingham representing the purchase price of a lot in Sterling Manor West, the subdivision being developed by Residential Planners, Inc. The Culbersons signed a building construction agreement on July 20, 1972 with Planned Homes, Inc., which was designated as builder of a house to be constructed *Page 349 
on Lot 5, Sterling Manor West. Among the clauses contained in this construction agreement is one stating that "the property shall be conveyed by a general warranty deed to the purchaser by the builder after the final payment has been made to the builder," and another stating that:
 Physical possession of improvements to said real estate shall be deemed to have been surrendered by the Buyer to the Builder as of the time work is commenced hereunder and to continue in said Builder until said work is completed, and the Buyer shall [not] be entitled to occupancy of said premises or any part thereof unless and until the aforesaid contract sum, adjusted as to additions and deductions, if any, have been determined and paid in full.
The designation of Lot 5 was later changed to Lot 4 by Griffin who endorsed a copy of the plans and specifications of the Culberson home with the following:
 Lot 5 on the contract dated 7/20/72 has been changed to read Lot 4 instead of Lot 5. George Griffin.
Griffin explained that this change was made necessary due to an inadvertence in the numbering of the lots in the subdivision, and that on the finally approved plan which was recorded, Lot 5 as referred to in the contract actually was Lot 4 as shown on the plat. This, he stated, was the lot he and the Culbersons agreed upon. He did not remember when he made this change. In fact, when he later applied to the Bank for a construction loan he still thought the Culbersons were on Lot 5, and, in fact, all the money he drew from the bank on that loan went to another lot, not to the Culberson lot.
Plans and specifications for the Culberson house were furnished to the Bank with Griffin's loan application on behalf of Planned Homes, Inc. The outside of these bore the symbols "SM-5" in red ink which had been written over with "SM-4" in green. The site plan and specifications furnished the Bank, however, bore "Lot 5."
At the time the parties entered into the construction agreement Griffin signed as President of Residential Planners, Inc. Griffin explained this signature as an inadvertence since Planned Homes, Inc. did the construction work, while Residential Planners, Inc. bought the land to be built upon and sold it to Planned Homes, Inc., all for tax purposes. At this juncture we note that the Bank's answer denied the Culbersons' legal title and denied that the contract was with Residential, contending that the contract was between the Culbersons and Planned Homes, Inc. This agreement was not recorded. Within a week after the Culbersons submitted the check to Griffin for the purchase price of the lot, Griffin nailed a visible "sold" sign on a pine tree in the front of what he thought was Lot 5. Two weeks later another visible sign was placed upon the same tree below the first sign, this one reading "Custom Built for Mr. Mrs. Bill Culberson."
The Culbersons delivered to Griffin three additional checks aggregating over $27,000.00 made payable to Planned Homes, Inc., drawn on The First National Bank to cover installments on the construction of their house, and these checks were paid to Griffin by the Bank. Approximately three weeks after the Culbersons paid their fourth installment, the outside doors to their home were hung. Because the interior was being finished, Mrs. Culberson unlocked the house each morning for the workmen (apparently the building superintendent also had keys to the house), and then locked the house each night, meanwhile placing some of their personal possessions in the house. The record reveals that while the work was going on and until completion Mrs. Culberson was physically present on the premises during the day before September 25, 1972, although Mrs. Culberson stated that:
. . . for some time after September 25, 1972, my husband and I continued to maintain our home in Fairfield. We spent nights in our home in Fairfield, and continued to maintain it as a home until April 29, 1973, at which time we moved the remainder of our household furnishings not previously moved into the new house. *Page 350 
On September 25, 1972, Griffin made application to The First National Bank of Birmingham for a construction loan on Lot 4. Using a form provided by the Bank, he signed in his capacity as President of Planned Homes, Inc. The form called for the name and address of the purchaser of the house and a copy of the sales contract should the house on which the loan was negotiated have been pre-sold. In the space provided for this information, Griffin inserted a dash (—), which, he stated, he meant that it wasn't sold. He added:
 At that point in time this property was not the Culbersons' property, as far as I was concerned. . . . At the time I made it they had Lot 5. In my own mind they had Lot 5. And I was placing a loan on Lot 4, which later didn't jive.
The Bank approved the loan application and took a mortgage, September 25, 1972, on Lot 4 from Planned Homes, Inc. This mortgage was recorded October 3, 1973 in the Probate Judge's Office, Jefferson County, Bessemer Division. A deed from Residential Planners, Inc. to Planned Homes, Inc., executed September 20, 1972, was recorded with this mortgage. During this time the Culbersons continued to make payments under their construction agreement with Planned Homes, by checks drawn on the defendant Bank, and Planned Homes gave them a deed to Lot 4 on April 26, 1973. Also during this period, an agent of the defendant Bank inspected the lot in question at least three times after the signs had been posted and after the Culbersons had placed possessions in the house.
On October 5, 1973, the Bank proceeded to foreclose on the mortgage given it by Planned Homes, Inc. The Culbersons filed their complaint on November 2, 1973, posted bond and received a temporary injunction against the Bank restraining this foreclosure. On August 8, 1975, the Culbersons filed a motion for summary judgment based upon pleadings, affidavits, depositions and exhibits. The Bank did likewise on October 13, 1975. On November 6, 1975, the trial court granted the Culbersons' motion for summary judgment, denied the Bank's similar motion, set aside the Bank's mortgage, and permanently enjoined the Bank from foreclosing the mortgage.
The basic issue raised by the Bank on this appeal is whether the trial court erred in finding that the Bank was not a bona fide purchaser for value, i.e., that the Bank was a purchaser with knowledge of facts sufficient to put it on inquiry regarding the Culbersons' prior equity at the time the Bank took its mortgage from Planned Homes, Inc. on Lot 4. If we could determine from the record that the status of the Bank's mortgage in relation to the Culbersons' equity remains in issue, this would require a reversal of the trial court's decision.
Elements of a bona fide purchase, enumerated in Murphree v.Henson, 289 Ala. 340, 267 So.2d 414 (1972), include (1) a purchase of legal title, (2) in good faith, (3) for adequate consideration, (4) without notice of any claim of interest in the property by any other party. The law of this state charges a purchaser with notice of the contents of instruments by which he takes title and of all facts which would be disclosed by reasonably diligent search. Jefferson County v. Mosley,284 Ala. 593, 226 So.2d 652 (1969).
In granting the plaintiffs' motion for summary judgment it is apparent that the trial court found that there was no genuine issue of material fact on the question whether the defendant Bank was a bona fide purchaser for value when it took its mortgage from Planned Homes, Inc. on October 3, 1972. And in that connection, we quote from the trial court's order:
 The undisputed facts as appear in the Affidavit of Plaintiff, Dillie Ray Culberson, show that Defendant George Griffin turned over to Plaintiffs the keys to Plaintiffs' home on September 22, 1972, prior to Defendant Bank's mortgage, and that the Plaintiffs locked the home each night, and returned each morning to unlock the doors so that Defendant Griffin's workmen could complete the inside work; . . .
. . . . . *Page 351 
 None of the above facts were disputed by counter affidavits or otherwise. These facts showing acts of actual possession were clearly open, visible, and obvious. These facts are undenied except in Defendant Bank's Answer which states in Paragraph 2 thereof ". . . plaintiffs did not have legal title to the lot nor were plaintiffs in possession of it when the Bank's mortgage was recorded", and again in Paragraph 11 thereof ". . . Bank again denies that plaintiffs had any legal title to the lot and had actual or constructive possession of said lot at such time. . .". The denial of Plaintiffs' possession in Defendant Bank's Answer is insufficient on Motion for Summary Judgment, in that Rule 56 (e) ARCP clearly provides that: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of the pleadings. In fact, it can be perilous for the opposing party neither to proffer any countering evidentiary materials nor to file an affidavit. Ray vs. Midfield Park, Inc., 308 So.2d 686; 293 Ala. 609.
In this we have concluded that the trial court erred, since there is at least a scintilla of evidence furnished by the deposition of the witness Jones, the Bank's real estate inspector, contesting the possession of Lot 4. In that deposition offered by the Bank in support of its own summary judgment motion filed after that of the plaintiffs, Jones states that he first inspected Lot 4 when the foundation was laid and found some lumber there also. This inspection was made in connection with Griffin's application for a loan, and he inspected the premises about once or twice a month thereafter, and "watched it go up from the foundation on." He did not know when the Culbersons actually moved in, and did not recall having seen Mrs. Culberson before the deposition was taken. Not only did this evidence make an issue of the Culbersons' possession, but both Mrs. Culberson's deposition and the trial court's order show that workmen were present much of the time when Mrs. Culberson was at the site. While the trial court may have been correct in characterizing the Culbersons' acts of possession as "open, visible, and obvious," it is questionable whether these acts were also unambiguous and exclusive, as our cases require. Lightsey v. Stone, 255 Ala. 541, 52 So.2d 376
(1951). Notwithstanding the fact that the Culbersons had keys to the house before they actually began to live there, Mrs. Culberson's own statement poses the question whether their possession was exclusive, or joint with Griffin because his workmen were still present on the premises, apparently in accord with the construction agreement. A joint possession with the vendor is not unambiguous, but equivocal. O'Neal et al. v.Prestwood, 153 Ala. 443, 45 So. 251 (1907).
Therefore, in connection with plaintiffs' motion for summary judgment, there was more before the court than defendant's denial in its answer. The rule of Ray v. Midfield Park, Inc.,293 Ala. 609, 308 So.2d 686 (1975) does not apply.
In determining whether a summary judgment is proper, the ultimate question is whether there remains a genuine issue of material fact, and if there is one, summary judgment is inappropriate, Rule 56 (e) ARCP; 6 Moore's Fed. Prac., par. 56.15 (2nd ed. 1971). Put in another way, "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Lyons,Alabama Practice, p. 352.
For the error in granting the plaintiffs' motion for summary judgment when there was a genuine issue of material fact, *Page 352 
the nature of plaintiffs' possession, the case must be reversed and remanded. This action renders it unnecessary to comment upon the other issues presented by the parties.
REVERSED AND REMANDED.
MADDOX, FAULKNER and EMBRY, JJ., and FRANK B. EMBRY, Supernumerary Circuit Judge, sitting by designation of the Chief Justice, concur.