409 So.2d 743 (1981)
SIMMONS MACHINERY COMPANY, INC.
v.
M & M BROKERAGE, INC.
M & M BROKERAGE, INC.
v.
SIMMONS MACHINERY COMPANY, INC.
CREDIT ALLIANCE CORPORATION
v.
M & M BROKERAGE, INC.
Nos. 79-861, 79-889 and 79-891.
Supreme Court of Alabama.
October 2, 1981.
Rehearing Denied February 5, 1982.
*746 William H. Mills of Redden, Mills & Clark in No. 79-861, C. Stephen Trimmier of Trimmier & Hartman in No. 79-889, Charles L. Robinson and Patricia Clotfelter of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, in No. 79-891, for appellants.
C. Stephen Trimmier of Trimmier & Hartman in No. 79-861, William H. Mills of Redden, Mills & Clark in No. 79-889, C. Stephen Trimmier of Trimmier & Hartman, Birmingham, in No. 79-891, for appellees.
ADAMS, Justice.
These consolidated appeals come to us from the Circuit Court for Jefferson County where they were tried together before a jury. This litigation arose out of disputed commercial transactions between the parties. Due to the numerous issues raised, each appeal will be considered separately.

*747 I

SIMMONS MACHINERY CO., INC. v. M & M BROKERAGE, INC.
This appeal by Simmons Machinery Co., Inc. (Simmons), raises numerous issues arising out of an adverse judgment against it in favor of M & M Brokerage, Inc. (M & M). M & M was engaged in the brokerage of coal and in coal mining at times pertinent to this litigation. Simmons is a dealer in heavy machinery. Credit Alliance Corporation (Credit Alliance) is a finance company. M & M commenced an action against Simmons and Credit Alliance on June 28, 1977. The disputes that form the bases of M & M's complaint arise out of two transactions. One involves M & M's purchase of a drill from Simmons. The other involves a dragline purchased by M & M which was sold originally by Simmons. The dragline installment purchase contract was assigned at one time to Credit Alliance.
M & M's complaint against Simmons and Credit Alliance alleged various causes of action. Those pertinent to the issues raised by this appeal are causes of action alleging that Simmons converted the drill and failed to account to M & M for the proceeds of its sale. M & M alleged also that both Simmons and Credit Alliance failed to satisfy a recorded security interest in the dragline. The trial court, in its pre-trial order of September 27, 1979, granted summary judgment in favor of M & M against Simmons on the issue of liability for the alleged conversion of the drill. By the same pretrial order, summary judgment on the issue of liability was granted in favor of M & M against Simmons and Credit Alliance for alleged failure to satisfy the recorded security interest in the dragline. Except for the statutory penalty of $100.00 provided in Code 1975, § 7-9-404(1), for failure to file a termination statement by a secured party, the other issues of damages were submitted to the jury. The jury returned a verdict in the amount of $23,000.00 on M & M's conversion claim against Simmons. No other awards were returned by the jury. Simmons's counterclaim against M & M for breach of warranty of title on a drill traded to it by M & M was dismissed at the close of evidence pursuant to M & M's motion for a directed verdict.
After our review of the issues raised by the parties, we find no error in the action of the trial court or in the jury's verdict. We, therefore, affirm the judgment. We will consider separately the issues raised by each transaction.

The Drill

Summary Judgment
M & M purchased a new Drill Tech drill from Simmons on March 2, 1976, for a purchase price of $175,000.00. M & M received a credit of $41,000.00 toward the purchase price on its trade-in of a Chicago Pneumatic drill. The remainder of the purchase price M & M financed by executing an installment payment conditional sales contract and security agreement. The sales contract and security agreement were assigned by Simmons with recourse to Alabanc Financial Corporation (Alabanc).
Eventually, M & M defaulted on its payments. Alabanc, now the secured party, sent M & M a letter (infra) on November 16, 1976, demanding that M & M's account be brought current immediately and threatening resale of the drill if it was not.
M & M made no additional payments and apparently by agreement with Simmons, M & M allowed it to obtain possession of the drill on December 2, 1976. Simmons was not the secured party at the time it obtained the drill from M & M. On December 22, 1976, Alabanc reassigned M & M's purchase contract for the drill to Simmons. Simmons sold the drill on that same day to a third party at a private sale for $140,000.00. At the time of the sale the principal and interest due on the contract totaled $133,715.21. The entire balance of the sales price Simmons allocated to the costs and expenses of collection, repossession, and resale. Except for the letter from Alabanc of November 16, 1976, M & M received no further purported notice concerning the intended disposition of the drill.
*748 In its pre-trial order of September 27, 1979, the trial court ruled that M & M had not waived its right to notice of intended disposition of the collateral by the secured party in interest, provided by Code 1975, § 7-9-504(3), and that the purported "notice" provided by Alabanc's letter of November 16, 1976, was insufficient to satisfy the same section of our code. Accordingly, the trial court entered summary judgment on the issue of liability against Simmons for conversion of the drill.
Simmons first argues that the trial court erred in holding that M & M had not waived its right to notice of the intended disposition of the drill. Whether a debtor can waive its right to notice under Code 1975, § 7-9-504(3), after default, previously has not been decided by this court. In essence, Simmons contends that M & M waived its right to notice by allegedly agreeing after default that if the arrearage was not paid by a certain date, the drill could be sold and the proceeds applied to liquidate the obligation.
Although the recently enacted amendments (Acts 1981, No. 81-312)[1] to § 7-9-504 and other sections of Article 9 of our Uniform Commercial Code expressly allow a debtor to waive his right to notice after default, the present effective section is silent about this issue. The current § 7-9-504(3) provides:
Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.
Not all courts are in agreement as to whether a debtor may waive his right to notice under U.C.C. 9-504(3) after default. Some courts prohibit such a waiver. Hall v. Owen County State Bank, Ind.App., 370 N.E.2d 918 (1978). Other states allow a post-default waiver. Nelson v. Monarch Investment Plan of Henderson, Inc., 452 S.W.2d 375 (Ky.1970). Although our present § 7-9-504(3) does not specifically allow a post-default waiver of notice by a debtor, we are of the opinion that the better position on this issue is to allow such a waiver. We are mindful that a default debtor's right to notice of the intended disposition of the secured collateral is one of the most important rights affording a debtor protection of his interest in the secured collateral under the U.C.C. Accordingly, we hold that a post-default waiver by a debtor of his right to notice under § 7-9-504(3) can be made where the debtor knowingly and specifically agrees to waive his right to such notice. We reject the reasoning of Nelson v. Monarch Investment Plan of Henderson, Inc., supra, that recognizes an implicit waiver by the act of a debtor returning the collateral to the secured party and stating he did not want the collateral returned.
Having determined that a debtor can waive his right to notice under § 7-9-504(3), we now turn to the question of whether M & M effected a waiver of its right. The facts as alleged by Simmons show at the most that M & M voluntarily *749 relinquished the drill to Simmons with the intention of either redeeming it, or having it sold and the proceeds applied to the outstanding debt. These facts are insufficient to constitute a waiver. Even under the cases cited by Simmons as supporting its position, the instant facts fail to show a sufficient manifestation of intent to waive one's right to notice under U.C.C. 9-504(3). Gavin v. Washington Post Employees Federal Credit Union, 397 A.2d 968 (D.C.Cir. 1979); Citizens State Bank v. Sparks, 202 Neb. 661, 276 N.W.2d 661 (1979); McKee v. Mississippi Bank & Trust Company, 366 So.2d 234 (Miss.1979); Grant County Tractor Co. v. Nuss, 6 Wash.App. 866, 496 P.2d 966 (1972).
We find no inconsistency between M & M's act of agreeing to a surrender and sale of the drill if necessary, and M & M's insistence of its right to notice of disposition in the event M & M could not redeem the drill. The importance of the notice requirement of § 7-9-504(3) has been noted by our Court of Civil Appeals:
The purpose of the notice is to enable the debtor to protect his interest in the property by paying the debt, finding a buyer, being present at the sale to bid on the property or have others do so, in order to keep from sacrificing the collateral at a secret sale at less than its true value.
Wells v. Central Bank of Alabama, N. A., 347 So.2d 114, at 120 (Ala.Civ.App.1977). Similarly, the Iowa Supreme Court, commenting on Iowa's § 9-504(3) of the U.C.C., stated:
The notice provision in Code section 554.9504(3) is obviously intended for the benefit and protection of the debtor. It affords him at least an opportunity to bid at the sale and protect himself from an inadequate sale price. A debtor unable or unwilling to exercise his section 554.9506 redemption right may still wish to bid on the property or encourage others to do so to insure a fair sale price which would minimize or eliminate a deficiency.
Even if it might be determined he could not have protected his interest the law requires he be given the opportunity.
Herman Ford-Mercury, Inc. v. Betts, 251 N.W.2d 492 (Iowa 1977).
In McKee v. Mississippi Bank & Trust Company, supra, the Mississippi Supreme Court, in discussing the type of notice required by U.C.C. 9-504(3), observed that the secured party was required to send written notice to the debtor. The Mississippi Supreme Court remarked, citing other authority, that "the requirement of a written notice eliminates all possibility of dispute as to whether a notice was actually given. It also establishes what notice was given." McKee, at 238. We are of the opinion that the converse also is true. Under our holding today, an effective post-default waiver of notice by a debtor must be in writing. A written waiver of notice will serve the dual purpose of protecting a debtor's right to notice, and eliminating dispute as to whether a waiver occurred. In the event a secured party is unable to obtain a written waiver from a defaulting debtor, it can simply provide written notice itself of the intended disposition of the collateral, as it otherwise would have to do, and thereby comply with § 7-9-504(3).
Because we have decided that M & M did not waive its right to notice, we next consider whether the purported notice that it received from Alabanc by its letter of November 16, 1976, was legally sufficient.[2] The text of that letter is as follows:
 November 16, 1976
CERTIFIED MAIL
M & M Coal Brokerage, Inc. P. O. Box 96 Fairfield, Alabama 35064
Re: Transaction # 07-20761
 One Model D40-K Drill Tech
 Drill,
 S/N 570189
Gentlemen:

*750 Mr. Johnny McDonald of your company advised Mr. Bill Muramoto of our company on Tuesday, November 16, 1976 that the above referenced account would be brough [sic] current by Friday, November 19, 1976. The amount to bring the account current quoted to Mr. McDonald on November 11, 1976 was $14,588.91. However, since that time, the November 16th installment has fallen due and the amount necessary to bring the account current on Friday, November 19, 1976 is $19,217.03.
If this amount is not received by us on or before Friday, November 19, 1976, you will have until Monday, November 29, 1976 to repurchase the account in the amount of $133,425.77. After this date, the Drill will be elgible [sic] for resale. [Emphasis added.]
We look forward to seeing you on Friday, November 19th and hope that the other alternatives outlined above can be foregone.
 Yours very truly,
 ALABANC FINANCIAL
 CORPORATION
 Jack Lefler
 Credit Specialist
JL/lw
cc: John McClellan
 Johnny McDonald
bcc: Simmons Machinery
At the outset we note that the above purported notice is deficient and cannot satisfy the requirements of § 7-9-504(3). The letter is more of the nature of a demand for payment. Also, it is tentative in nature in that it states "the drill will be eligible for resale." The letter, therefore, does not "identify the type of sale or the time after which private sale would be made." Citizens State Bank v. Sparks, 202 Neb. 661, 276 N.W.2d 661, at 664 (1979). Under Code 1975, § 7-9-504(3), the notice requirements for a public and private sale of the collateral are different:
Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral.
The purported "notice" by Alabanc, upon which Simmons attempts to rely, satisfies neither of the above quoted requirements.
Simmons argues, nevertheless, that the U.C.C. does not require that a secured creditor specify the type of sale. Simmons theorizes that if a notice states a time and place of sale, it is obviously a public sale, but if it states only a time after which the collateral will be sold, notice is provided of a private sale. Although Simmons's argument is logical, we reject it, nevertheless. Code 1975, § 7-1-201(26), provides that:
A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when:
(a) It comes to his attention; or
(b) It is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.
Implicit in the concept of notice under the U.C.C. is the requirement that notice clearly convey its purpose. To accept Simmons's reasoning of the sufficiency of the alleged notice would subject a default debtor to an exercise in logic and statutory interpretation. Such a result is incompatible with concepts of clarity and reasonableness of notice under the U.C.C.
Simmons argues that Rainey v. Ford Motor Credit Company, 294 Ala. 139, 313 So.2d 179 (1975), supports its contention that Alabanc's letter was sufficient notice of a private *751 sale. Simmons points to the fact that in the Rainey decision this court noted that Rainey received notice that his truck would be sold in ten days unless redeemed. Simmons argues, therefore, that because the notice in Rainey was sufficient to comply with the notice requirements for a private sale under § 7-9-504(3), so is Alabanc's letter of November 16, 1976, sufficient notice for a private sale. The fallacy with Simmons's argument is that this court never decided the sufficiency of the notice involved in Rainey. The notice involved in Rainey is mentioned by this court only as factual background. That case was decided on other grounds not involving the sufficiency of the notice received by Rainey. We are, therefore, unable to attach to Rainey the precedential value Simmons urges we ascribe to it.
Simmons's sale of the collateral without satisfying the notice requirements of Code 1975, § 7-9-504(3), constituted a conversion. Wells v. Central Bank of Alabama, N.A., 347 So.2d 114 (Ala.Civ.App. 1977). In the absence of prior notice the issue of conversion was clearly a question of law. Because no genuine issue of material fact existed, the trial court properly granted summary judgment against Simmons on the issue of liability for conversion. Harold Brown Builders, Inc. v. Jordan Company, 401 So.2d 36 (Ala.1981).

Damages
Simmons advances several reasons urging reversal of the award against it for conversion of the drill. The following discussion of two issues raised by Simmons is dispositive of the propriety of the damage award to M & M. Simmons first argues that the trial court erred by allowing Johnny McDonald as a witness for M & M to testify to the value of the drill. McDonald was the secretary-treasurer of M & M. McDonald testified that he had operated the drill and was familiar with it because he had seen it at least every two weeks, and had seen it last about two weeks before Simmons regained possession of it. McDonald testified further that he had tried to sell the drill and held negotiations to refinance it. Code 1975, § 12-21-114, provides: "Direct testimony as to the market value is in the nature of opinion evidence; one need not be an expert or dealer in the article, but may testify as to value if he has had an opportunity for forming a correct opinion." Interpreting the predecessor of the above-quoted statute, the Alabama Court of Appeals stated:
A witness is allowed to give his opinion of value, if he has had an opportunity of forming a correct opinion. This is a preliminary question to be passed upon by the court and is a matter largely within his discretion. 22 C.J. 526 (610)b. This discretion will not be reviewed except in cases where it is clearly made to appear that the ruling was unjust and worked an injury to defendant's cause. 22 C.J. 526 (610)b, and Alabama authorities cited under note 11.
Morris v. State, 25 Ala.App. 494, at 495, 149 So. 359, at 360 (1933). The Court of Appeals went on to recognize the liberal application of what is now § 12-21-114:
In the instant case the opportunity for observation by witnesses who testified as to their opinion of the aggregate value of the stock of victrolas in the storehouse that was burned was most casual and superficial, and this court expresses the opinion that the trial judge was extremely liberal in his rulings as to the qualifications of such witnesses; but even so the error is not so apparent as to require a reversal on this point.
Morris v. State, 25 Ala.App. at 496, 149 So. at 360. Under the above precedent, we find no error in the trial court allowing McDonald to testify to the value of the drill.
Simmons next argues that because McDonald had not seen the drill for more than one month before the date of conversion (December 22, 1976), and had not checked the prices of heavy machinery since March 1976, he, therefore, had no opportunity for forming a correct opinion regarding its value as required by Code 1975, § 12-21-114. We disagree. In Richard Kelley Chevrolet, Inc. v. Williams, 343 So.2d 776 (Ala.Civ.App. *752 1977), the Court of Civil Appeals upheld the admissibility of testimony as to the value of an automobile by a witness who was described as not having seen the automobile for an indefinite time, perhaps six months before its sale. Speaking for the Court of Civil Appeals, Judge Wright stated:
We accept the contention that the value of the automobile at a time six months prior to conversion is not the proper measure of damages. However, we do not accept the contention that the plaintiff, having seen his automobile six months before, could not be qualified to state his opinion of its value at the time of conversion six months later. Such testimony would be relevant but subject to attack as to its credibility. We do not find error in the admission of the answer of plaintiff in this case.
Richard Kelley Chevrolet, Inc. v. Williams, at 779. Similarly, this court has held that "The degree of opportunity that the witness may have had for forming an opinion goes to the weight of the evidence and not to its admissibility." Blount County v. Campbell, 268 Ala. 548, at 554, 109 So.2d 678, at 683 (1959). Accordingly, we find McDonald's testimony was admitted properly.
Simmons argues that McDonald was allowed to testify to the "worth" of the drill, rather than to its fair market value, which is the measure of damages for conversion. Ott v. Fox, 362 So.2d 836 (Ala. 1978). At the outset we note from the record that Simmons failed to object to M & M's attorney's posing the question with the term of "worth" rather than "fair market value." "It is our well-settled rule that a party who fails to object to matters at the trial level may not raise these matters for the first time as the basis for an appeal." Record Data International, Inc. v. Nichols, 381 So.2d 1, at 4 (Ala.1980). We decline, therefore, to further consider Simmons's argument.
We next consider Simmons's contention that the award of damages against it was erroneous. We have decided already that summary judgment as to the issue of liability for conversion was entered properly against Simmons, and also that McDonald's testimony as to the value of the drill was admitted properly. McDonald testified that the drill had a value of between $155,000.00 and $165,000.00. It is undisputed that the payoff on the drill was $133,715.21. Ott v. Fox, 362 So.2d at 841 (Ala. 1978), states that "The measure of damages for conversion is the difference between the reasonable fair market value of the item converted and the balance due on the mortgage debt at the time of conversion, plus interest." Under the facts of this case, the jury properly could have returned an award of $23,000.00, employing the measure of damages stated in Ott v. Fox. We find no error in the award against Simmons.

Simmons's Counterclaim

The Chicago Pneumatic Drill
When M & M purchased the Drill Tech drill from Simmons, it received a credit of $41,000.00 toward the purchase price by its trade-in of a Chicago Pneumatic drill. Simmons subsequently attempted to sell the trade-in drill at auction. First Western Bank advised Simmons that it had an unsatisfied security interest in that drill. Subsequently, First Western Bank acknowledged to Simmons that it had authorized the trade-in of the drill and consequently it was claiming no interest in it. Simmons filed a counterclaim against M & M for breach of warranty of title under Code 1975, § 7-2-312. At the close of evidence, the trial court granted M & M's motion for a directed verdict in its favor on Simmons's counterclaim. Simmons appealed and argues that the granting of the directed verdict was erroneous. We disagree. Code 1975, § 7-2-312, provides in pertinent part:
(1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that:
(a) The title conveyed shall be good, and its transfer rightful; and
(b) The goods shall be delivered free from any security interest or other lien or *753 encumbrance of which the buyer at the time of contracting has no knowledge.

(Emphasis added.)
At trial Simmons's vice-president and general manager, William Brogdon, testified on direct examination to the following:
Q. Did you have any conversation with either Mr. McDonald or Mr. McLellan before the transaction was closed about the condition of the title of that drill that was being traded in?
A. Yes, sir, I spoke to both of them at the same time.
Q. What did they tell you about the condition of title of that drill at the time?
A. They informed me that there was a mortgage on the drill, but that they would take care of it.
Q. Did they tell you who the mortgage was with?
A. Not at the time, no, sir.
On cross-examination M & M's attorney elicited the following testimony from Brogdon:
Q. You are telling us, these ladies and gentlemen of the jury, that these two men came in and told you they wanted to buy a new drill and were going to trade in an old drill and it had a mortgage on it and you didn't even ask them who the mortgage was with?
A. No, sir, I relied on their good faith.
Q. My question is, you did not ask them who the mortgage was with?
A. No, sir.
Brogdon's testimony clearly establishes that Simmons had knowledge of a lien or encumbrance on the Chicago Pneumatic drill. The "Official Comment" to § 7-2-312, notes that "The `knowledge' referred to in subsection 1(b) is actual knowledge as distinct from notice." There can be no doubt that Simmons had actual knowledge of the existence of a lien or encumbrance on the Chicago Pneumatic drill at the time of the transaction. Because of that knowledge, Simmons cannot complain that it later had difficulty with its title to the trade-in drill. The trial court properly directed a verdict in favor of M & M on Simmons's counterclaim.

The Dragline
This transaction has its origin in the purchase of the dragline from Simmons by Vernon Quinn on September 13, 1974. (Quinn was not a party to this litigation.) Simmons assigned the purchase contract to Credit Alliance. M & M purchased Quinn's interest in the dragline on October 8, 1975. M & M entered into a transfer and assumption agreement with Quinn and Credit Alliance. Simmons endorsed its approval of the agreement. M & M then took over and operated the dragline. Installment payments were made directly to Credit Alliance by M & M.
In January 1977 M & M defaulted on its payments. Credit Alliance accelerated the contract on January 26, 1977, and demanded payment in full. Credit Alliance quoted a payoff amount of $174,369.84, which M & M paid on February 5 or 6, 1977. A letter accompanied M & M's payoff which stated that the payoff was tendered on the basis that the security interest would be satisfied. The check bore a notation "M & M Loan, Pay-Off M & M Brokerage, Inc., Account # 35S-52141-9."
Unknown to M & M, on February 1, 1977, Credit Alliance executed a reassignment of the dragline contract to Simmons. By letter of March 3, 1977, M & M demanded that Credit Alliance satisfy the security interest or face a law suit. Credit Alliance responded by letter on March 8, 1977, and advised that Credit Alliance's right to collect under the contract had been assigned to Simmons on February 1, 1977. On March 31, 1977, M & M made a demand upon Simmons that it satisfy the security interest. Neither Simmons nor Credit Alliance satisfied the security interest.
The trial court granted M & M's motion for summary judgment for failure to satisfy the security interest against both Simmons and Credit Alliance. Summary judgment was granted for the statutory penalty *754 of $100.00 provided by Code 1975, § 7-9-404(1). The issue of compensatory damages for failure to satisfy the security interest was submitted to the jury. The jury found that M & M had not sustained a monetary loss or suffered any damages proximately caused by the failure to satisfy the security interest.
Simmons's first contention that the grant of summary judgment was in error centers on the sufficiency of information before the trial court at the time it granted summary judgment. Specifically, Simmons argues that because neither the recorded financing statement evidencing a recorded security interest in the dragline nor M & M's letter to Simmons demanding a termination statement on the security interest, was before the court when summary judgment was granted, it, therefore, was granted inappropriately.
Although factually correct, we find Simmons's contention to be without legal merit. It is clear from the record that there was no dispute as to the existence of the recorded security interest in the dragline and the demand letter. The deposition of George Simmons, President of Simmons Machinery Company, Inc., revealed that Simmons acknowledged the existence of the recorded security interest in the dragline and that Simmons did not file a termination statement because of the outstanding mortgage on the Chicago Pneumatic drill held by First Western Bank. The deposition of Johnny McDonald, President of M & M, indicated that M & M's attorney wrote to both Credit Alliance and Simmons about the title in the dragline. The trial court had those and other depositions before it when it granted summary judgment. Our review of the record before the trial court on summary judgment leaves us with no doubt that there was no dispute as to the existence of either document. Simmons, in fact, does not contend that the documents were non-existent, for they were admitted at trial. Instead, it argues that merely because they were not before the trial court at the time of its ruling on summary judgment, that ruling was erroneous. We disagree. Although the preferable practice is to submit such documents to the trial court for its consideration in ruling on a motion for summary judgment, under the facts of this case, we find no error in the trial court's ruling.
Simmons next argues that because Credit Alliance was the secured party of record, as evidenced by the financing statement, Simmons had no obligation to file a termination statement. We cannot accept Simmons's argument. In his deposition, George Simmons testified that about February 1, 1977, Simmons received the reassignment of the note from Credit Alliance. As noted already, he testified also that Simmons's reason for not filing a termination statement was the belief that there was an outstanding mortgage held by First Western Bank on the trade-in drill. Simmons, as the secured party, on written demand from M & M, was obligated to file a termination statement under Code 1975, § 7-9-404(1):
Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must on written demand by the debtor send the debtor a statement that he no longer claims a security interest under the financing statement, which shall be identified by file number. A termination statement signed by a person other than the secured party of record must include or be accompanied by the assignment or a statement by the secured party of record that he has assigned the security interest to the signer of the termination statement.
Simmons raises the defense that it was not obligated to file a termination statement because the dragline contract contained a future advances provision. That provision, Simmons says, had the effect of making the dragline security not only for its purchase price, but for all other debts owed by Simmons to the holder of the contract. Because M & M was indebted at all times to Simmons on an open account, Simmons maintains that payment of the dragline debt did not extinguish M & M's indebtedness *755 to it. Therefore, Simmons theorizes that it was justified in maintaining its interest in the dragline as security for M & M's debt on its open account. The difficulty with Simmons's position is that when M & M paid Credit Alliance the outstanding indebtedness on the dragline, it had no notice of Credit Alliance's assignment of the contract to Simmons. Code 1975, § 7-9-318(3), provides that an "account debtor is authorized to pay the assignor until the account debtor receives notification that the account has been assigned and that payment is to be made to the assignee." M & M properly paid Credit Alliance. Credit Alliance's acceptance of payment also constituted an acceptance of the terms under which the payment was tendered. Those terms provided that payment was made upon the condition that the security interest in the dragline be satisfied. Consequently, Simmons could not rely on the future advances provision in the contract to negate its duty to file a termination statement.
Lastly, Simmons contends that because M & M by evidence and contention questioned the validity and regularity of the transfer of the dragline contract from Credit Alliance to Simmons, the validity of the reassignment was in doubt. In essence, Simmons suggests that if the reassignment was ineffective, it had no duty to file a termination statement. Specifically, Simmons calls to our attention the fact that M & M showed it had no notice of the reassignment of the contract until after it paid its debt, and that Simmons paid no money for the transfer. It also notes that M & M showed that no cover letter accompanied the document effecting the reassignment when it was sent to Simmons, and that Simmons did not know whether M & M paid off the dragline debt before or after the reassignment. We find all of Simmons's contentions to be without merit. Simmons did not contend at the time of summary judgment, nor does it now, that the reassignment was ineffective. It is clear from the record that the validity of the reassignment was not in issue.
The appropriateness of granting summary judgment is well established:
In determining whether a summary judgment is proper, the ultimate question is whether there remains a genuine issue of material fact, and if there is one, summary judgment is inappropriate, Rule 56(e) ARCP; 6 Moore's Fed.Prac., par. 56.15 (2nd ed. 1971). Put in another way, "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." First National Bank of Birmingham v. Culberson, 342 So.2d 347, 351 (Ala.1977). More recently, the court observed in Campbell v. Alabama Power Co., 378 So.2d 718, 721 (Ala.1979), that the scintilla evidence rule applies to summary judgment motions:
This rule must be considered in the context of the scintilla evidence rule applicable in Alabama. Thus, if there is a scintilla of evidence supporting the position of the party against whom the motion for summary judgment is made, so that at trial he would be entitled to go to the jury, a summary judgment may not be granted. Donald v. City National Bank of Dothan, 295 Ala. 320, 329 So.2d 92 (1976). Furthermore, all reasonable inferences from the facts are to be viewed most favorably to the non-movant. Tolbert v. Gulsby, 333 So.2d 129 (Ala.1976).
Harold Brown Builders, Inc. v. Jordan Company, 401 So.2d 36 at 37-8 (Ala.1981).
The above standard was met in this case. The judgment of the trial court is affirmed.
AFFIRMED.

II

M & M BROKERAGE, INC. v. SIMMONS MACHINERY COMPANY, INC.
M & M appeals from the trial court's granting of summary judgment against several counts in its complaint. First, M & M alleged that Credit Alliance was guilty of fraudulent misrepresentation by overstating the payoff amount on the dragline. *756 Second, M & M alleged that Credit Alliance converted its payoff check because it accepted it on the condition that the security interest in the dragline would be satisfied, but that it did not satisfy the security interest. Third, M & M alleged that Credit Alliance committed a tort by obtaining money by false pretenses. In granting summary judgment in favor of Credit Alliance, the trial court reasoned that because it granted summary judgment in favor of M & M, ruling that Credit Alliance was under a legal obligation to provide a termination statement, it received credit for its payoff and, therefore, Credit Alliance could not be guilty of larceny or conversion. The trial court did allow M & M's theory that Credit Alliance and Simmons committed fraud by failing to satisfy the security interest in the dragline.
The court below erroneously granted summary judgment against M & M on its theories of fraudulent misrepresentation, conversion, and obtaining money by false pretenses. As M & M correctly argues, the torts it alleges could support an award of punitive damages upon a proper showing. Ott v. Fox, 362 So.2d 836 (Ala. 1978); Winn-Dixie Montgomery, Inc. v. Henderson, 371 So.2d 899 (Ala.1979); Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976), appeal after remand 348 So.2d 1377 (Ala.1977). Additionally, we note that the trial court's ruling that M & M was not entitled to proceed on its count alleging conversion because it had been compensated for the payment that was converted also was erroneous. Even where converted property is returned, the fact of return does not prevent recovery, but merely reduces damages. Roebuck Auto Sales, Inc. v. Wallace, 293 Ala. 231, 301 So.2d 546 (1974); Coffee General Hospital v. Henderson, 338 So.2d 1022 (Ala.Civ. App.1976).
Credit Alliance argues that the trial court did not err in granting summary judgment against M & M on counts alleging the above mentioned theories of recovery because it allowed one count alleging fraud to go to the jury. We find that argument to be without merit. The difference between the theories of recovery and their encompassed issues in the counts that were dismissed, and the one that was submitted to the jury does not allow resolution of the theory of fraudulent failure to satisfy the lien to resolve the other theories.
M & M next contends that the trial court erred by granting Credit Alliance's motion in limine and by preventing M & M from proving that Credit Alliance failed to refund unearned interest to M & M when it paid off the dragline debt. The motion in limine prevented M & M from using the handwritten note on the sheet of paper on which Credit Alliance calculated the payoff amount. That sheet contained the following note: "Balance on card plus late charges and C/E. No refund per JEC." The trial court reasoned that because summary judgment had resolved the issue of Credit Alliance's decision not to refund unearned interest to M & M, that failure and the notation served no purpose other than to prejudice Credit Alliance at trial on the other claims asserted against it by M & M. We recognize that a trial court has discretion to exclude evidence that serves no purpose other than to arouse prejudice or confuse a jury. American Pamcor, Inc. v. Evans, 288 Ala. 416, 261 So.2d 739 (1972). Nevertheless, it is also the rule that "in actions for fraud and deceit, great latitude is allowed in the scope of the evidence introduced ...." Old Southern Life Insurance Company v. Woodall, 348 So.2d 1377 at 1385 (Ala.1977). The failure to refund and the notation could reasonably support an inference of fraud. As M & M argued, the notation was one of M & M's strongest pieces of evidence of fraud on the part of Credit Alliance. Therefore, we find that the trial court erred by granting the motion in limine, and by not allowing M & M to inquire into the issue of Credit Alliance's failure to make a refund.
Credit Alliance argues that it was questionable as to whether a refund was due M & M for unearned interest. Credit Alliance states that it was uncertain whether the Code 1975, § 5-19-4(c) ("Mini-Code"), *757 applied to the transaction so that a refund was due. Additionally, it believed that Georgia law, which allegedly did not require a refund, controlled the transaction. It argues, therefore, that its failure to provide a refund was merely a reasonable interpretation of law, which, even if erroneous, did not constitute actionable fraud. As supportive of its position, Credit Alliance cites Bank of Loretto v. Bobo, 37 Ala.App. 139, 67 So.2d 77 (1953); and, United States v. Burgreen, 591 F.2d 291 (5th Cir. 1979). We find those cases not helpful in supporting Credit Alliance's contention that summary judgment was granted properly. The above cited cases discuss the rule that generally misrepresentations as to a matter of law are not actionable, with certain exceptions. This is not a case involving a misrepresentation of law, because Credit Alliance clearly made none. Instead, the basis of M & M's allegation is that Credit Alliance fraudulently misstated the payoff amount on the dragline. Credit Alliance's argument that it provided the payoff amount in good faith based upon its interpretation of the law is in the nature of a defense and a question of fact to be resolved at trial.
Credit Alliance contends that there was no evidence before the trial court to indicate fraud or deceit by it, and that the grant of summary judgment, therefore, was proper. We disagree. Our review of the record before the trial court showed evidence to support M & M's fraud claims. The deposition of J. E. Clement, senior vice-president of Credit Alliance showed the following: Credit Alliance accelerated payments due under the dragline contract and then, on February 1, 1977, assigned the contract to Simmons before the ten-day period expired that it gave M & M to make its payoff. Simmons paid nothing for the reassignment. Credit Alliance accepted M & M's payoff on February 5, 1977, even though the contract had been reassigned to Simmons. It had made an appointment for Johnny McDonald of M & M to come to its office in Atlanta on that date to make the payoff. Simmons had a close relationship with Credit Alliance, which received "a good share" of its financing. M & M's payoff was accompanied with its letter stating that it was for payment in full of the debt and satisfaction of the security interest. Credit Alliance deposited the check in its account, but did not advise M & M that the contract had been reassigned to Simmons until it received M & M's letter of March 3, 1977, threatening action if the security interest was not satisfied. By its own calculation, Credit Alliance computed a refund due of $4,717.82, but did not make one. We do not intimate that Credit Alliance perpetrated a fraud on M & M. Nevertheless, we are unable to say there was not a scintilla of evidence supporting M & M's fraud claims. Harold Brown Builders, Inc. v. Jordan Company, 401 So.2d 36 (Ala.1981); Campbell v. Alabama Power Co., 378 So.2d 718 (Ala.1979).
Lastly, M & M alleges as error the trial court's failure to permit the jury to award punitive damages under Code 1975, § 7-9-404(1), for Credit Alliance's failure to satisfy the security interest in the dragline upon written demand. The trial court allowed the jury to award compensatory damages, but it found none was due M & M. We have reviewed the record and do not find that M & M preserved error by a proper objection to the trial court's instruction of the jury on this issue. Nor does M & M, in its brief, note anywhere in the record where it preserved this alleged error. Under Rule 51, A.R.C.P., "In order to preserve an error in charging the jury ... it is necessary that the party make an objection and state the grounds therefor." Louisville and Nashville Railroad Company v. Garrett, 378 So.2d 668, at 673 (Ala.1979). Accordingly, because M & M failed to preserve the alleged error, we need not decide this issue. However, as stated above, we find that M & M should be allowed to pursue its theories of fraudulent misrepresentation of the payoff amount, conversion of the payoff check, and the alleged tort of obtaining money by false pretenses, and the trial court erred by granting summary judgment as to those counts. Finally, because the trial court erroneously granted Credit Alliance's motion in limine preventing M & M from proving *758 an overcharge and excluding Credit Alliance's notation of no refund on its calculation sheet it committed error requiring a new trial on the fraud charge that was submitted to the jury.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

III

CREDIT ALLIANCE CORPORATION v. M & M BROKERAGE, INC.
Credit Alliance Corporation appeals from a judgment entered against it in favor of M & M Brokerage, Inc. In its complaint, M & M alleged that Credit Alliance failed to credit it with an interest rebate when M & M made an accelerated payment of its indebtedness due on a dragline that was financed by Credit Alliance. In its pre-trial order, the trial court ruled that Credit Alliance was required under Code 1975, § 5-19-4(c), to make the disputed rebate, and it entered summary judgment against Credit Alliance. The consolidated cases later were tried before a jury on other unresolved claims of the parties.
After summary judgment was entered against it, Credit Alliance moved for a reconsideration of the trial court's order, raising for the first time the defense that Georgia law controlled the dragline loan. Credit Alliance contended that under Georgia law, no refund of any time-price differential was required for early prepayment of a commercial installment debt. The trial court denied Credit Alliance's motion to reconsider and a judgment in the amount of $11,468.06 was entered against it at the conclusion of trial.
Credit Alliance maintains the trial court erred by not reconsidering the order granting summary judgment against it. Under Rule 54(b), A.R.C.P., Credit Alliance points out that the grant of summary judgment was interlocutory in nature because it disposed of fewer than all the claims of the parties. Credit Alliance notes further that under Rule 54(b), A.R.C.P., the order of summary judgment against it was subject to revision at any time before final judgment on all the parties' claims. It concludes, therefore, that the trial court should have reconsidered its order, applied Georgia law, and entered judgment in its favor. For reasons discussed herein, we affirm the judgment of the trial court and do not reach the conflicts of law issue advanced by Credit Alliance.
A party desiring to raise an issue concerning the law of another jurisdiction must comply with Rule 44.1, A.R.C.P. In pertinent part, Rule 44.1, A.R.C.P., provides that "The party who intends to raise an issue concerning the law of another state or of any territory or dependency of the United States or of a foreign country shall give notice in his pleadings or other reasonable written notice." Contained in that provision is the requirement that an issue of foreign law shall be raised in a timely manner. Credit Alliance did not raise the issue of the applicability of Georgia law in its pleadings. We, therefore, look to the notice provided in Credit Alliance's motion to reconsider to determine whether it timely raised its conflicts of law issue.
The complaint in this case was filed by M & M on June 28, 1977. In its pre-trial order of September 27, 1979, the trial court ruled that the Mini-Code applied to the disputed transaction, and rendered summary judgment in favor of M & M. A supplementary pre-trial order was rendered on February 20, 1980. Credit Alliance, on February 27, 1980, filed its motion to reconsider and revise the trial court's ruling on summary judgment, contending for the first time that the law of Georgia controlled the dragline loan. The consolidated cases were tried before a jury beginning on March 5, 1980, and a verdict was returned on March 14, 1980. Credit Alliance's motion, thus, was filed almost three years after M & M commenced action, nearly five months after the trial court's initial pre-trial order and ruling on summary judgment, and one week before trial.
This court has stated that there are two relevant factors to be considered in determining a party's compliance with the notice requirement of Rule 44.1, A.R.C.P. *759 These factors are "reasonable notice to the adversary and closeness of trial date." Semo Aviation, Inc. v. Southeastern Airways Corp., 360 So.2d 936, at 941 (Ala.1978). Under the facts of this case, we are unable to find that Credit Alliance provided timely or reasonable notice of its intention to raise the issue of the applicability of Georgia law. We discern no justifiable reason, and Credit Alliance advances none, to allow us to conclude that the issue of the applicability of Georgia law arose late in the case so as to make timely Credit Alliance's motion. We reject Credit Alliance's argument that the main issue on M & M's claim for an interest rebate was whether the Mini-Code applied to a commercial transaction, and that it properly waited until the resolution of that issue before arguing the applicability of Georgia law to the loan. Whether Georgia law applied is a defense that was capable of being raised from the beginning of this litigation. The fact that an alternate defense, or issue, concerning the applicability of the Mini-Code also existed and was being litigated did not relieve Credit Alliance of the duty to raise its conflicts of law defense in a timely manner under Rule 44.1, A.R. C.P. There is nothing improper in raising more than one defense, even though the favorable resolution of one may moot resolution of another. To hold otherwise would allow a defendant to withhold presenting potentially viable and timely defenses until the resolution of an alternate defense. The resultant delay that such a holding would foster would be inconsistent with Rule 1(c), A.R.C.P., which provides that our rules of procedure "shall be construed to secure the just, speedy and inexpensive determination of every action."
Credit Alliance correctly argues that the partial summary judgment rendered by the trial court was subject to revision at any time before the entry of judgment adjudicating all the parties' claims, rights, and liabilities, under Rule 54(b), A.R.C.P. Although it is true that the partial summary judgment in this case was subject to revision as Credit Alliance argues, such revision was not mandatory upon the trial court where Credit Alliance failed to raise its conflicts of law issue in a timely manner. Whether a trial court revises a partial grant of summary judgment, as allowed by Rule 54(b), A.R.C.P., is a matter of discretion which, absent an abuse, we will not disturb. United States v. Desert Gold Mining Company, 433 F.2d 713 (9th Cir. 1970); Winbourne v. Eastern Airlines, Inc., 479 F.Supp. 1130 (E.D.N.Y.1979), rev'd on other grounds, 632 F.2d 219 (2d Cir. 1980); See: Wheeler v. Brotherhood of Locomotive Firemen and Enginemen, 324 F.Supp. 818 (D.S.C.1971). In this case the trial court could have properly, within its discretion, declined to entertain Credit Alliance's motion to reconsider. The judgment of the trial court is affirmed.
AFFIRMED.

IV

CONCLUSION
In summation, we affirm the judgment of the trial court in the appeals of (79-861) Simmons Machinery Co., Inc. v. M & M Brokerage, Inc. and (79-891) Credit Alliance Corporation v. M & M Brokerage, Inc. In the appeal of (79-889) M & M Brokerage, Inc. v. Simmons Machinery Company, Inc., the trial court's judgment is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
Case No. 79-861, AFFIRMED.
Case No. 79-889, AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
Case No. 79-891, AFFIRMED.
TORBERT, C. J., FAULKNER, ALMON and EMBRY, JJ., concur.

ON APPLICATION FOR REHEARING
ADAMS, Justice.
In case 79-889 Simmons seeks a rehearing for the purpose of clarifying this court's opinion of October 2, 1981. Specifically, Simmons maintains that our order affirming in part, reversing in part, and remanding for further proceedings not inconsistent *760 with our opinion, does not operate so as to require a new trial as to it. Simmons is correct. Although the style of this appeal contains Simmons's name, M & M's appeal sought relief only as to Credit Alliance. Thus, our remandment does not effect a new trial against Simmons. Our original opinion is hereby extended, and Simmons's application for rehearing is overruled. We also overrule Credit Alliance's application for rehearing.
Case No. 79-889-APPLICATIONS OF SIMMONS MACHINERY CO., INC., AND CREDIT ALLIANCE OVERRULED; OPINION EXTENDED.
Case No. 79-861-APPLICATION OF SIMMONS MACHINERY CO., INC., OVERRULED.
TORBERT, C. J., and FAULKNER, ALMON and EMBRY, JJ., concur.
NOTES
[1] Effective February 1, 1982.
[2] The parties have raised the issue of whether Simmons can rely on the purported notice from Alabanc. At the time that the purported notice was given, Alabanc, and not Simmons, was the secured party. Our holding makes it unnecessary to decide that issue.