Rel: December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0117

_____

### Jonathan Patrick

### v.

### Morgan Patrick

### Appeal from Madison Circuit Court
### (DR-23-900081.80)

FRIDY, Judge.

This is the second time Jonathan Patrick ("the husband") and Morgan Patrick ("the wife") have come before this court in this divorce action. In Patrick v. Patrick, 419 So. 3d 555, 557 (Ala. Civ. App. 2024), the husband appealed the judgment of the Madison Circuit Court ("the

trial court") divorcing him from the wife, dividing their marital assets, awarding the wife alimony, and awarding him sole legal and sole physical custody of the parties' eight-year-old child ("the child"). In that appeal, we reversed the judgment insofar as it awarded the wife alimony and divided the parties' marital property and remanded the case with instructions to the trial court to comply with the requirements of § 30-2-57, Ala. Code 1975. The trial court has entered an amended judgment, as directed, without changing the amount of the alimony award or the division of the marital property. The husband, appearing pro se, appeals from the amended divorce judgment. For the reasons set forth herein, we affirm the judgment.

<u>Background</u>

The parties married on June 8, 2013, and the child was born almost two years later. On January 27, 2023, the husband commenced a divorce action against the wife, and, on April 5, 2023, the wife answered the complaint and filed a counterclaim for divorce. The trial court held a trial in the action on January 30, 2024.

The husband, who was thirty-nine years old at the time of the trial, testified that the wife and he met on an Internet site and began a long-

distance relationship. The wife lived in Ohio and the husband was an undergraduate student and working at the University of Alabama at Huntsville ("UAH"). The parties dated for about four years before getting married, he said. After the wife moved to Alabama in 2009, the husband said, he realized that she had a drinking problem, which, he said, was a "frequent point of friction in [their] relationship." The husband did not drink alcohol and said that he would characterize himself as naive about alcohol consumption.

At the trial, the wife's testimony was often confusing or evasive. She said that she had been in a detoxification center in the weeks leading up to the January 2024 trial because, as she put it, she had "an alcohol problem." She said that she had been treated in an alcohol-rehabilitation center once before but that that treatment had not been successful. In addition to receiving treatment at rehabilitation facilities, the wife said, she had been hospitalized several times for alcohol-related issues, including pancreatitis, in the five years leading up to the husband's filing of the divorce complaint, and doctors had told her that she would die if she did not stop drinking. The wife, who was forty years old when the trial was held, acknowledged that she had been drinking one and a half

3

to two pints of alcohol a day. During the litigation of this case, the trial court ordered the wife to submit to color-code alcohol testing, but she did not comply, saying that she did not have the money to do so.

The wife conceded that her alcohol use had had a negative effect on the marriage. However, she said, the husband had been "an enabler," bringing alcohol home to her. She said that she believed that the husband bought the alcohol about 75% of the time. Even after the husband filed the divorce action, the wife said, he bought about 40% or 50% of the alcohol she drank. She said that she asked the husband to attend counseling so that he would understand living with a recovering addict but that he did not follow through with that request. She also testified that the husband's conduct had a role in the breakdown of the marriage. She said that "he became old too quick" and that there were things she still wanted to do. She said that, "[o]nce he got his big boy job, he wasn't coming home as much." When the husband was home, she said, he would "sit in front of the Xbox," adding that they never went anywhere or did anything.

The husband testified that he had purchased alcohol for the wife, but not to the extent to which the wife testified. He explained that the

4

wife was not openly drinking in front of him and was sneaking alcohol into the house. In 2021, the husband said, he confronted the wife about her drinking and told her it had to stop. He said that she told him that the way that he could help her "was by buying it and hiding it in the house so that she could taper off." He said that he "would pour a shot and hide it, and then whenever the [wife's] craving got too bad, she would go find wherever [he] hid it and then drink it." He said that he first purchased liquor for the wife in 2021. However, the husband said, the wife then began calling him at work to tell him that she "need[ed] a pint," and so, he said, he would buy liquor for her so that she would not drink and drive. Once the divorce action had been filed, the husband said, he bought liquor for the wife when she would have some item of his and threaten to damage it if he did not buy her alcohol.

The wife admitted that, during the marriage, she had had "inappropriate" relationships with a man in Germany, D.H., and a man in Finland, J.L., both of whom she met on the Internet. She admitted "sexting" with both men. She volunteered that she "really liked" D.H. and "was tapped out of the marriage by then." She testified that she had told the husband that she was thinking about moving to Germany and that

she was thinking about having a child with D.H. She said that the last time she had talked with him was the day before the trial.

The wife said that J.L came to Huntsville and that she had sex with him at his hotel. She said that she had told J.L. that she loved him and that she had talked about having a baby with him as well, adding that she wanted another child. The last time she had talked to him was the morning of the trial.

The wife said that, during the pendency of the case, she had sent money to both D.H. and J.L. to repay loans they had made to her, but, it was pointed out, during her deposition she had said that she was sending one of the men money to buy a crock-pot for his mother. She testified that she was using the husband's money to repay the loans.

The husband testified that he became aware of the wife's relationship with D.H. in early 2021, when he saw sexually explicit messages on the wife's cellular telephone. He said that he demanded that she end the relationship, but the wife continued it. He said that he learned about J.L. in March 2022 when he saw a sexually explicit conversation between the wife and J.L. on Facebook, a social-media

6

website. He said that he learned that the wife had had a sexual relationship with J.L. after the wife's deposition in this matter.

The husband, who has a master's degree, was employed as the head of the Complex Systems Integration Lab at UAH. He also worked part time as an adjunct faculty member for the mathematics department and for the systems engineering department. He said that he had had a difficult time balancing life and work and that his focus during the marriage was on trying to get out of debt, but that that was not the wife's focus.

The husband testified that, at the time of the trial, his annual income was about $178,000. A paystub admitted into evidence indicated that his monthly net income was $9,202.38. At the time of the trial, he said, he had about $63,000 in his retirement account with the Retirement Systems of Alabama ("RSA"), to which he had begun contributing in September 2016. He said that that account would vest ten years after that date. He said that he had no other retirement accounts and that the wife did not have a retirement account.

The husband testified that, when the child was younger, the wife did not work outside the home. The wife, who has a GED and no

7

subsequent education, testified that, early in the marriage, she had worked as an assistant manager at a fast-food restaurant and as a promotional model and sales representative for Core USA. After the child was born, the mother stayed home to raise the child. During the year before the trial, she had worked several places, including at a children's museum, at a restaurant, at KLA Schools, at a fast-food restaurant, and at a preschool, the name of which she could not remember. She said that she never worked at any of those places for more than two or three months. Her testimony regarding why she left those jobs was evasive. She said that she was able to work only part time because she was "a little bit" disabled as a result of her depression and anxiety; however, she said, she was not receiving disability payments from any source. The only time she worked forty hours a week, she said, was a week or two when she worked at both the children's museum and at a restaurant, and, she said, "it was very overwhelming." After leaving the preschool, the wife said, she sought employment "a couple of times" but then realized that she needed to focus on her recovery. She was not employed at the time of the trial.

The parties were married when they purchased the marital residence in 2013. At the time of the trial, the balance of the loan secured by the mortgage was $218,538. The husband paid the mortgage each month. The wife testified that she had made some improvements to the house and had paid for some improvements with her inheritance, which she said was $17,500. The husband testified that he did not recall the wife using any of her inheritance on the house, but he acknowledged that the wife's father "did a lot for the house" by making repairs, painting, installing a sink and an outside light, and performing a substantial amount of wiring work. He also said that the wife initially did landscaping but that she stopped a few years after the child was born. He conceded that both he and the wife had contributed to the marital residence, which he estimated had a value of $240,000 because, he said, it was in considerable need of repairs. The wife testified that she believed it was worth between $260,000 and $270,000. A real estate agent who viewed the house and testified on behalf of the husband said that, after looking at the house, he believed that it had a value of about $240,000 in its current condition but that it would be worth more if repairs were made. A real estate agent who testified on behalf of the wife said that,

9

based on comparable listings and considering the square footage of the marital residence, he believed that the house had a value of about $304,000 if it was in good condition. He said that he had not seen the house.

At the time of the trial, the wife drove a 2021 Kia Sorento that was paid for. She estimated its value at $20,000 but said that it had been damaged when she went through a car wash the wrong direction. The husband submitted an estimate from the Kelley Blue Book indicating that that vehicle had a trade-in value of $15,421. The husband drove a 2019 Honda Insight on which $10,358 was owed. He said that he owed more on that vehicle than what it was worth and submitted an estimated trade-in value from the Kelley Blue Book of $5,698. The parties also had a 2015 Kia Sedona that the husband said was inoperable because the head gasket on it had blown; the husband testified that $9,600 was still owed on that vehicle.

The wife said that her name was on two credit cards and that she made charges on those cards "every once in a while." The husband submitted an exhibit indicating that the balance owed on those credit cards was $1,187.17. The wife later testified about having several other

credit cards and said that her credit cards were "maxed out" because of lawyers' bills and her living expenses. The husband testified the wife used more than just the two credit cards she had mentioned. He said that he owed multiple debts to various credit-card companies and submitted an exhibit indicating that the debt owing on the credit cards in his name was $29,520. That debt was incurred for family expenses, he said. The wife said that the husband had purchased video games and math books. She testified that the parties had a collection of video games that she estimated was worth about $10,000.

The husband testified that the child attended the Montessori School of Huntsville and that the tuition is about $1,300 per month. He also said that the wife's visitation with the child was supervised and that the supervision fee was $190 per visit.

The husband told the trial court that he wanted it to award him the marital residence. When asked whether he was "willing to take all of that debt, whatever it amounts to, that you all incurred," the husband responded that that was correct. He also said that he would continue to carry the child on his health-insurance policy, which his employer provided.

11

On February 2, 2024, the trial court entered a judgment divorcing the parties in which it awarded the husband sole legal custody and sole physical custody of the child and awarded the mother supervised visitation. The parties were directed "to split the cost of the visitation." The trial court awarded the husband the marital residence and directed that he would be solely liable for the debt on the marital residence. The trial court found that the fair value of the marital residence was $270,000 and that the parties had equity of $51,461.10. It directed the husband to pay the wife half of that amount, $25,730.55, for her portion of the equity.

The trial court awarded the wife the 2021 Kia Sorento, all items of personal property in her possession, and all banking accounts in her name. It awarded the husband the 2015 Kia Sedona and the Honda Insight and made him responsible for the remaining debt on those vehicles. It also awarded him the personal property in his possession and the banking accounts in his name. The trial court ordered that each party was responsible for all debts in his or her name. It directed the parties to close any joint credit-card accounts they had.

The trial court also awarded the wife 25% of that portion of the husband's RSA retirement account that he had earned during the

marriage. It determined that the parties were married for a total of seventy-six months that coincided with the husband's employment and that, therefore, when the husband retired, the wife's share of his retirement would be calculated by the following formula:

> "((Number of Months Married (76)/Total Number of Months Enrolled in the Retirement System) multiplied by 25%) multiplied against the gross monthly pension of the Husband."

Finally, the trial court ordered the husband to pay the wife "periodic alimony" of $1,500 per month for thirty-six months or until she should die or remarry or the alimony terminated otherwise by law.

In the first appeal, this court reversed that part of the judgment related to the award of alimony because, we concluded, it did not contain the findings of fact that § 30-2-57 requires to support an award of alimony. On remand, the trial court amended that portion of its judgment, awarding the same amount of alimony, explicitly stating that the alimony was rehabilitative rather than periodic, and adding the findings that § 30-2-57 requires. Specifically, the trial court found that the wife lacked a separate estate sufficient to enable her to preserve the status quo that existed during the marriage, that the husband had the

13

ability to supply those means without undue economic hardship, and that its award was equitable under the circumstances.

The husband appeals from the amended judgment.

## Standard of Review

When this court reviews a divorce judgment entered after the presentation of ore tenus evidence, we will presume that the trial court's findings on disputed facts are correct, and we will not reverse its judgment based on those findings unless the judgment is palpably erroneous or manifestly unjust. Crenshaw v. Crenshaw, 386 So. 3d 42, 51 (Ala. Civ. App. 2023). The presumption of correctness of factual findings under the ore tenus rule "is based on the trial court's unique position to observe the witnesses and to assess their demeanor and credibility." Glazner v. Glazner, 807 So. 2d 555, 559 (Ala. Civ. App. 2001). Furthermore, "the ore tenus standard of review has no application to a trial court's conclusions of law or its application of law to the facts; a trial court's ruling on a question of law carries no presumption of correctness on appeal." Ex parte J.E., 1 So. 3d 1002, 1008 (Ala. 2008) (citing Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994)).

## Analysis

The husband, appearing pro se, contends that the trial court erred in determining that the value of the marital residence was $270,000, which, he argues, is essentially the average between the $240,000 estimate the real-estate agent who testified on his behalf gave and the $304,000 estimate the real-estate agent who testified on behalf of the wife gave. The husband argues that the trial court should not have considered the testimony of the wife's witness because that witness had not viewed the house.

In support of his contention, the husband relies on <u>Simmons Machinery Co. v. M & M Brokerage, Inc.</u>, 409 So. 2d 743, 747 (Ala. 1981), which involved the valuation of personal property, specifically a drill, for the purpose of determining the amount of damages to be awarded in a dispute over a commercial transaction. In <u>Simmons Machinery</u>, our supreme court, quoting § 12-21-114, Ala. Code 1975, wrote: "'Direct testimony as to the market value is in the nature of opinion evidence; one need not be an expert or dealer in the article, but may testify as to value if he has had an opportunity for forming a correct opinion.'" 409 So. 2d at 751. The court then explained:

> "Interpreting the predecessor of the above-quoted statute the Alabama Court of Appeals stated:

"'A witness is allowed to give his opinion of value, if he has had an opportunity of forming a correct opinion. This is a preliminary question to be passed upon by the court and is a matter largely within his discretion. 22 C.J. 526 (610)b. This discretion will not be reviewed except in cases where it is clearly made to appear that the ruling was unjust and worked an injury to defendant's cause. 22 C.J. 526 (610)b, and Alabama authorities cited under note 11.'

"Morris v. State, 25 Ala. App. 494, at 495, 149 So. 359, at 360 (1933). The Court of Appeals went on to recognize the liberal application of what is now § 12-21-114:

"'In the instant case the opportunity for observation by witnesses who testified as to their opinion of the aggregate value of the stock of victrolas in the storehouse that was burned was most casual and superficial, and this court expresses the opinion that the trial judge was extremely liberal in his rulings as to the qualifications of such witnesses; but even so the error is not so apparent as to require a reversal on this point.'

"Morris v. State, 25 Ala. App. at 496, 149 So. at 360."

Id.

The husband contends that, in Simmons Machinery, our supreme court used the expression "the opportunity for observation by witnesses" as quoted from Morris "for setting a foundation for interpreting the expression 'formed a correct opinion,'" which, he says, indicated that our

16

supreme court interpreted the phrase "having a chance to form a correct opinion" to mean "having an opportunity for observation." Husband's brief at 15. Because the real-estate agent who testified on behalf of the wife had not observed the marital residence, the husband argues, he did not have the opportunity to form a correct opinion, and, therefore, the husband asserts, the trial court should have disregarded that testimony. We disagree.

The wife's witness explained that he based his valuation of the marital residence on the square footage of the house and on the value of comparable properties. The husband makes no assertion that that method is an improper means by which to value real estate. More fundamentally, the husband failed to object to the testimony of the wife's witness or to the submission of the written valuation of the marital residence that that witness had prepared, and, as a result, to the extent that the trial court considered the wife's expert witness's valuation of the marital residence, we cannot hold it in error for doing so. See Whetstone v. Caudle, 307 So. 2d 697, 700-701 (Ala. Civ. App. 1975) ("The law in Alabama is that the trial court will not be put in error unless the matter

17

complained about was called to its attention by objection or other appropriate method.").

In addition, the husband's argument pertaining to this issue is premised on the notion that the trial court averaged the expert witnesses' valuations in arriving at its valuation of the house. However, the trial court did not make findings to explain how it determined that the marital residence had a value of $270,000. The wife testified that, in her opinion, that house was worth between $260,000 and $270,000, and the trial court may have relied on that testimony. See, e.g., Edwards v. Edwards, 26 So. 3d 1254, 1261 (Ala. Civ. App. 2009) ("Either party was permitted to testify regarding their opinion of the value of the marital property; an appraisal was not required to establish the value of the property."), overruled on other grounds by Enzor v. Enzor, 98 So. 3d 15 (Ala. Civ. App. 2011). When an appellate court reviews the findings of a trial court based on ore tenus evidence, it "is not permitted to reweigh the evidence, because weighing the evidence is solely a function of the trier of fact." Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). Based on the evidence presented, we cannot conclude that the trial court's determination of the value of the marital residence was plainly and palpably wrong or

manifestly unjust. Crenshaw v. Crenshaw, 386 So. 3d 42, 51 (Ala. Civ. App. 2023). Therefore, the judgment is due to be affirmed as to this issue.

The husband next contends that the trial court's division of marital property and its award of rehabilitative alimony to the wife is not equitable. The division of marital property and the award of alimony are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either issue. Rockett v. Rockett, 77 So. 3d 599, 602 (Ala. Civ. App. 2011). In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties' marriage; and the source, value, and type of marital property. Stone v. Stone, 26 So. 3d 1232, 1236 (Ala. Civ. App. 2009). "The weight or importance assigned to any one of these factors is primarily left to the trial court's discretion when apportioning property. This discretion will not be disturbed on appeal unless found to be plainly and palpably wrong." Antepenko v. Antepenko, 549 So. 2d 1357, 1359 (Ala. Civ. App. 1989). "A court has no fixed standard to follow in ... dividing marital property. Rather, the ... division need only be equitable and be supported by the particular facts

19

of the case." Ex parte Elliott, 782 So. 2d 308, 311 (Ala. 2000). Moreover, an appellate court cannot substitute its judgment for that of the trial court; instead, the appellate court is to determine whether sufficient evidence supports the trial court's decision "'against a charge of arbitrariness and abuse of discretion.'" Id. (quoting Ex parte Smith, 673 So. 2d 420, 422 (Ala. 1995)).

The husband claims that the property division and award of rehabilitative alimony to the wife will result in undue financial hardship for him. Specifically, he says that the trial court's order requiring him to pay $190 per month as his share of the cost of the wife's supervised visits with the child and $1,500 a month for thirty-six months in rehabilitative alimony, when added to his other monthly expenses, including the mortgage payment, two car payments, the child's school tuition of about $1,300 per month, and various credit-card payments, would bring his total monthly expenses to $8,133.44, leaving him, he says, with only $1,068 per month. He asserts that, over the course of a year, after receiving $1,068 per month plus two additional paychecks totaling $9,202.38 (he explained that two months each year he receives three paychecks rather than two), he would be left with only $22,029 a year

after his monthly obligations are paid, which, he says, will place him "barely above the poverty level." When the cost of paying the wife $25,730.55 for her share of the equity in the marital residence is considered, the husband claims that the trial court's judgment will financially cripple him.

To support his argument, the father cites <u>Stein v. Stein</u>, 623 So. 2d 318 (Ala. Civ. App. 1993), a child-support-modification case in which the father's monthly child-support obligation was increased and he was required to pay an additional amount toward his son's college education. In reversing the modification judgment, this court found that, when that judgment was entered, the father did not have the financial ability to support himself, to pay child support, periodic alimony, and insurance premiums as previously ordered, and to pay an additional $200 in college expenses. Additionally, the trial court pointed out, the father was paying off a loan he had taken out to pay the debts of the marriage and the cost of the divorce. <u>Id.</u> at 319.

Here, the evidence indicates that the husband earns $178,000 annually and that his net monthly income is $9,202.38. The judgment requires him to pay rehabilitative alimony of $1,500 per month to the

wife and to cover half the cost of her visitation with their child (approximately $190 per month). In his brief, the husband calculated that his minimum credit-card payments came to $1,025 per month. Deducting those court-ordered costs from the husband's net monthly income leaves him with about $6,487 per month, or more than $77,000 annually, of net income to cover his own expenses. Put another way, the court-ordered monthly payments the husband is required to make leave him with roughly 70% of his income to cover his monthly expenses. At trial, the husband submitted a list of his other expenses, which included his mortgage payment, personal loans, including his student loan, car payments, cell-phone bill, Internet service, utilities, automobile insurance, and home security, which based on figures provided in the husband's brief, come to about $4,137, leaving him with about $2,350 remaining each month to cover any additional expenses.[1] The evidence

---

[1]The husband also argues that he will be responsible for the child's tuition at a private school, which, he says in his brief, bank records indicate is $1,281 per month; however, the judgment does not require that the husband keep the child at that school and incur that expense. As mentioned, the husband's calculations indicate that, even when the child's private-school tuition is considered along with his other monthly expenses, he has $1,068 remaining each month to pay for additional expenses.

simply does not support the husband's contention that he does not have the financial ability to pay the court-ordered costs of visitation and rehabilitative alimony.

The husband also contends that the trial court's division of marital property and award of rehabilitative alimony is not supported by the evidence. It appears that the husband's argument as to this issue is that the trial court's division of marital property and allocation of debt is inequitable, particularly in light of the evidence regarding the wife's drinking and adultery.

The trial court divorced the parties on the ground of incompatibility of temperament. In the judgment, the trial court awarded the husband the marital residence but awarded the wife half of the equity in the residence at the time of the divorce; it awarded the husband two vehicles, both of which had balances owed on the loans taken out to purchase them, and the wife one vehicle that was paid for; it awarded the parties the personal property each had in his or her possession and banking accounts in his or her name; and it awarded the wife 25% of the retirement benefits the husband had earned during the marriage. At the time of the trial, the husband's RSA account contained more than $63,000. In allocating the

debt, the trial court made the husband responsible for the indebtedness on the marital residence and the two vehicles that it had awarded to him and ordered each party to be responsible for credit cards held in his or her individual name.

In arguing that the division of the marital assets and the allocation of debts were inequitable, the husband essentially asks this court to reweigh the evidence in a light most favorable to him. He asserts that the wife received 66% of the value of the marital property. Specifically, he calculated that she received 50% of the equity in the marital residence, 25% of the retirement benefits that accrued during the marriage once he retires, and the Kia Sorento, which, he argues in his brief, the wife's attorney had valued at $26,107 and which was paid for in full. However, the wife testified at trial that the vehicle was worth $20,000, and the Kelley Blue Book estimated trade-in value was $15,421, more than $10,000 less than the figure the husband uses in his argument as to this issue.

In total, the husband said, the wife received the equivalent of $51,837 and he was awarded the equivalent of $25,730, which is his share of the equity in the marital residence. In making his calculation, he

disregards the asset with the most value, i.e., his RSA retirement account, which contained more than $63,000 at the time of the trial. Even if the husband were to leave his job before being fully vested, he would receive the balance contained in that account. Twenty-five percent of $63,000 is $15,750, meaning the husband's share would be $47,250.

The husband argues that the wife was required to take on $1,187 in credit-card debt while he was ordered to take on what he calculated as $39,171 in marital debt. Put another way, the husband argues, he received -$13,441 in the divorce judgment while the wife received $50,650.38. However, if the trial court assigned the Kelley Blue Book value of the vehicle it awarded to the wife, which it was free to do, the total value of the wife's award would be about $40,000. Additionally, when the husband's share of his RSA account is considered, his award is $33,810. A marital estate includes retirement or pension benefits accumulated during the marriage and those benefits are subject to division as marital property. See Whitehurst v. Whitehurst, [Ms. CL-2024-0064, Oct. 4, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024); Spuhl v. Spuhl, 99 So. 3d 339, 341 (Ala. Civ. App. 2012); § 30-2-51, Ala. Code 1975.

Not only does the husband's calculation of the parties' respective awards ignore the RSA retirement account, it also ignores the trial court's award to the parties of the personal property in his or her possession at the time the divorce judgment was entered. We cannot discern from the record what was included in that personal property, its value, or who possessed it at the time the judgment was entered. Moreover, the trial court made no express findings regarding the nature or value of the personal property. It is the appellant's burden of showing error on the record. See Cameron v. Cameron, 259 So. 3d 662, 667 (Ala. Civ. App. 2016). In Cameron, this court explained that,

> "because the parties failed to introduce evidence of the value of most of the assets, including the marital residence, specifically included in the judgment dividing the marital property or the items of personal property that were awarded to the parties, we are unable to conduct a meaningful review of whether the property division is equitable. Accordingly, we cannot say that the trial court's judgment dividing the marital property is plainly and palpably wrong."

Id. at 667-68 (emphasis added).

Similarly, in Combs v. Combs, 4 So. 3d 1141 (Ala. Civ. App. 2008), this court acknowledged that the husband in that case was ordered to pay all of the marital debt, in addition to the insurance on the vehicle awarded to the wife in that case, and rehabilitative alimony for five years.

26

Id. at 1149. The wife was awarded some of the marital assets but no liabilities. Id. However, because the parties failed to provide evidence of the value of vehicles, the parties' business, or their personal property, we concluded that it was impossible for us to determine whether the judgment was inequitable. Id.

Here, because we lack pertinent information regarding the type and value of the parties' personal property and who received any specific personal property, we cannot undertake a meaningful review of whether the division of marital property was equitable.

Furthermore, we note that, during that part of the trial testimony regarding the division of property and allocation of debt, the husband testified that he was "willing to take all of that debt, whatever it amounts to, that [the parties] have incurred." The trial court reasonably could have concluded from that statement that the husband voluntarily agreed to take on the parties' marital debt. In that case, under the doctrine of invited error, which "provides that a party may not complain of error into which he has led the court," Ex parte King, 643 So. 2d 1364, 1366 (Ala. 1993), he cannot now complain that the trial court erred in allocating most of the marital debt to him.

In reviewing whether a division of marital property is equitable, an appellate court cannot substitute its judgment for that of the trial court. Ex parte Durbin, 818 So. 2d 404, 409 (Ala. 2001); Ex parte Drummond, 785 So. 2d 358, 363 (Ala. 2000). "[T]he trial court may consider several factors, including the parties' respective present and future earning capacities, their ages and health, their conduct, the duration of the marriage, and the value and type of marital property, when dividing the marital property." TenEyck v. TenEyck, 885 So. 2d 146, 155 (Ala. Civ. App. 2003). Here, the husband was thirty-nine years old and the wife was forty years old at the time of the trial. The wife claimed that she suffered from anxiety and depression; there was no evidence indicating that the husband had any health issues. He had a master's degree and earned about $178,000 annually; the wife had a limited formal education, and she had worked primarily part-time jobs. The husband had a much greater earning potential than the wife. We recognize that the wife's adultery and drinking appear to have been the primary causes of the breakdown of the marriage, but with those considerations in mind, and based on the evidence contained in the record and the arguments of the parties, we cannot conclude that the trial court's award of rehabilitative

alimony and division of marital property is plainly and palpably wrong or manifestly unjust.

Finally, the husband contends that the trial court abused its discretion in refusing to grant the divorce on the ground of the wife's adultery. Instead, it divorced the parties on the ground of incompatibility of temperament. A trial court is not required to grant a divorce on the specific ground of adultery when it has properly considered evidence of adulterous conduct. "A trial judge does not have to grant a divorce on the grounds of adultery or to divide the property in light of one party's adultery unless the failure to do so would be palpably wrong." Jordan v. Jordan, 802 So. 2d 238, 240 (Ala. Civ. App. 2001), overruled on other grounds by Ex parte Fann, 810 So. 2d 631 (Ala. 2001).

Moreover, the trial court did not make findings of fact pertaining to the cause of the breakdown of the marriage. As with all judgments based on ore tenus testimony, the factual findings of the trial court based on that testimony are presumed correct; moreover, in the absence of express findings, the trial court is presumed to have made any findings necessary to the judgment if the record supports such findings. Allen v. Hill, 76 So. 3d 820, 822 (Ala. Civ. App. 2011). Here, we have no reason to question

29

the trial court's consideration of the evidence of the wife's adultery when it divided the marital property and awarded the wife rehabilitative alimony. Therefore, we are not persuaded that the trial court committed palpable error in basing the divorce on the ground of incompatibility, which the husband alleged in his complaint, rather than on adultery. See, e.g., Jordan, supra; E.A.B. v. D.G.W., 127 So. 3d 422, 429-30 (Ala. Civ. App. 2012); Roberts v. Roberts, 357 So. 2d 150, 151–52 (Ala. Civ. App. 1977).

## Conclusion

The husband has failed to demonstrate that the trial court erred in divorcing the parties on the ground of incompatibility of temperament, dividing the marital property, and awarding the wife rehabilitative alimony. Therefore, the judgment is affirmed.

AFFIRMED.

Hanson, J., concurs.

Moore, P.J., and Edwards, J., concur in the result, without opinions.

Bowden, J., dissents, with opinion.

BOWDEN, Judge., dissenting.

The main opinion affirms the judgment of the Madison Circuit Court ("the circuit court") that, in part, directs Jonathan Patrick ("the husband") to pay Morgan Patrick ("the wife") rehabilitative alimony in the amount of $1,500 per month for 36 months. The husband argues on appeal that he is unable to pay the circuit court's alimony award to the wife in combination with the other obligations created by the judgment and his normal expenses. The main opinion concludes that the burdens of the divorce judgment and the husband's expenses do not place him in undue financial hardship. I disagree; therefore, I respectfully dissent.

The spouse requesting alimony must first establish financial need, after which a circuit court must consider whether the other spouse can meet that need. Shewbart v. Shewbart, 64 So. 3d 1080, 1088 (Ala. Civ. App. 2010); see also Ala. Code 1975, § 30-2-57. Here, the husband does not argue that the wife did not demonstrate financial need; he argues only that he is unable to pay. In assessing a spouse's ability to pay an alimony award, this court has said:

> "The ability to pay may be proven by showing that the
> responding spouse has a sufficient separate estate, following
> the division of the marital property, see § 30-2-51(a), Ala.
> Code 1975, and/or sufficient earning capacity to consistently

31

provide the petitioning spouse with the necessary funds to enable him or her to maintain the parties' former marital standard of living. Herboso [v. Herboso, 881 So. 2d 454 (Ala. Civ. App. 2003)]. In considering the responding spouse's ability to pay, the trial court should take into account all the financial obligations of the responding spouse, including those obligations created by the divorce judgment. See O'Neal v. O'Neal, 678 So. 2d 161, 164 (Ala. Civ. App. 1996). The trial court should also consider the impact an award of periodic alimony will have on the financial condition of the responding spouse and his or her ability to maintain the parties' former marital lifestyle for himself or herself. Id. A responding spouse obviously has the ability to pay if the responding spouse can satisfy the entirety of the petitioning spouse's needs without any undue economic hardship. See, e.g., MacKenzie v. MacKenzie, 486 So. 2d 1289, 1292 (Ala. Civ. App. 1986)."

Shewbart, 64 So. 3d at 1088 (emphasis added).

Undue economic hardship exists when financial obligations created by a divorce judgment total a significant portion of the paying spouse's monthly net income. Rieger v. Rieger, 147 So. 3d 421, 434 (Ala. Civ. App. 2013). In Rieger, the trial court ordered the husband in that case to pay the wife in that case $7,985 in periodic alimony. Id. at 428. The husband was also ordered to pay a $2,200 monthly mortgage payment on a parcel of unimproved land that the parties jointly owned during the marriage. Id. The trial court also ordered that he pay $1,206 per month in child support. Id. In total, the trial court's judgment imposed a monthly

32

financial obligation of $12,211, which included the alimony award, mortgage payment, child support, and other expenses for taking care of the parties' minor child. Id. That amount was over 82% of the husband's gross income[2] and did not consider the husband's living expenses. Id. As a result, this court reversed the trial court's judgment, holding that the alimony award exceeded the husband's ability to pay when considered alongside his personal expenses and other financial obligations imposed by the final judgment. See also Stein v. Stein, 623 So. 2d 318, 319 (Ala. Civ. App. 1993) (finding undue hardship when the combination of financial obligations in the divorce judgment left the husband in that case with an income below the poverty level).

In the instant case, the husband is employed by the University of Alabama in Huntsville as the head of the Complex Systems Integration Lab. He also teaches part time as an adjunct professor in the mathematics and systems engineering departments. At the time of trial, his most recent tax return reflected a yearly income of $178,000. He

---

[2]The trial court improperly used the husband's average monthly gross income of $15,052 in its judgment, so this court noted that his net monthly income would necessarily be less. Id. at 434. In determining a spouse's ability to pay alimony, the trial court should use the spouse's net income. Rieger, 147 So. at 431.

submitted a paystub reflecting a biweekly net salary of $4,601.19, which would total a net salary of $9,202.38 per month.[3] The wife did not dispute that this amount accurately reflects the husband's salary.

The amended divorce judgment created the following financial obligations for the husband: $190 for his half of two supervised visitations between the wife and T.C.P. per month; a $545.34 monthly payment for the 2019 Honda Insight;[4] a $1,637.94 monthly mortgage payment on the marital home; $1,500 in alimony per month for 36 months; $1,025.13 total in monthly minimum payments toward credit-card debt; and an obligation of $25,730.55 in home equity to be paid to the wife within 6 months of the entry of the amended divorce judgment. Additionally, the husband's undisputed expenses include a $157.38 monthly student-loan payment, a $249.76 monthly personal-loan payment, and a $194.98 monthly personal-loan payment, all of which the amended divorce

---

[3]The husband testified that his income fluctuated throughout the year because he teaches only one course in the summer.

[4]The husband also has a $316.82 monthly payment for the 2015 Kia Sedona; however, nothing in the record suggests that he needs to maintain ownership of both vehicles.

judgment requires that he be solely responsible for.[5] The husband also pays T.C.P.'s school tuition, which is $1,281 per month.[6] The parties testified that they agreed to send T.C.P. to this school to best address his learning differences stemming from his autism-spectrum-disorder diagnosis. Additionally, the husband presented evidence of an additional $1,035 in monthly bills for his cell phone, internet, power, automobile insurance, and home-security system. The wife did not dispute the amount of any of these expenses.

The financial obligations solely created by the judgment total $5,500.53 or 60% of the husband's monthly net income. When the obligation of T.C.P.'s school tuition is added, the total increases to $6,781 or 74% of the husband's monthly net income. Finally, when including the husband's uncontested monthly expenses, the husband's total monthly obligations amount to $7,816.53 or 85% of the husband's monthly net

---

[5]The husband testified that he took out the two personal loans during the pendency of the divorce action to afford paying for a rental car for the wife while her vehicle was being repaired. (R. 110).

[6]As the husband has sole legal and sole physical custody of T.C.P., his financial situation is even further strained by having sole responsibility of providing for T.C.P. because the circuit court did not award the husband child support.

income. The remaining amount leaves the husband with $1,385.85 per month to pay for any additional expenses like groceries, clothing, toiletries, household goods, home repairs, and half of any health-care costs for T.C.P. beyond what insurance covers. Said another way, the remaining 15% of the husband's income adds up to $16,630.20 in net income for the year. For perspective, the federal poverty guideline for a two-person household for 2024 was $20,440. See Annual Update of Poverty Guidelines, 89 Fed. Reg. 2961 (Jan. 17, 2024); cf. Stein, 623 So. 2d at 319 (noting, when holding that judgment created undue hardship on the husband in that case, that the husband's total expenses put him "well below the poverty level").[7]

The facts of this case are also in line with Rieger, with the husband's financial obligations from the divorce judgment and personal expenses consuming a significant portion of his net income, placing him in undue economic hardship. The record before us shows that the

---

[7]On the date this Court issued its decision in this case, the United States Department of Health and Human Services poverty guidelines for 2024, which are formally referred to as "the poverty guidelines updated periodically in the Federal Register by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2)" and are commonly referred to as the federal poverty guidelines, could be found at: www.govinfo.gov/content/pkg/FR-2024-01-17/pdf/2024-00796.pdf.

financial obligations created by the circuit court's final judgment, when considered along with the father's other financial obligations, exceed the husband's ability to pay. See Shewbart, 64 So. 3d at 1088 ("In considering the responding spouse's ability to pay, the trial court should take into account all the financial obligations of the responding spouse, including those obligations created by the divorce judgment." (emphasis added)).

Therefore, I would reverse the circuit court's divorce judgment because the burdens of the judgment and the husband's expenses place him in undue financial hardship. As a result, I respectfully dissent.